[998 NYS2d 216]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOEL NELSON, Appellant.

Second Department, December 24, 2014

### APPEARANCES OF COUNSEL

*Lynn W. L. Fahey*, New York City (*Alexis A. Ascher* of counsel), for appellant.

*Kenneth P. Thompson, District Attorney*, Brooklyn (*Leonard Joblove* and *Morgan J. Dennehy* of counsel), for respondent.

### OPINION OF THE COURT

MILLER, J.

The defendant was charged by indictment with the murder of Leo Walton and the attempted murder of Mark Maldonado. At trial, the People presented evidence demonstrating that Maldonado invited the defendant into the apartment that Maldonado and Walton shared, and that once inside, the defendant shot Walton three times in the back of his head, then kicked in Maldonado's locked bedroom door, and shot him four times. The defendant did not testify at trial, but his statements (including a written statement and an audio- and video-taped statement) were introduced into evidence at trial by the People. In his statements, the defendant said that, inside the apartment, Maldonado fired a gun at him, but that he dove to the floor, and the shots hit Walton. The defendant then retrieved a .38 caliber handgun from his waist, followed Maldonado to Maldonado's room, and fired four shots. The defendant presented a justification defense at trial, based on the account he gave in his statements to law enforcement officials. The jury, rejecting the defendant's justification defense, found the defendant guilty of murder in the second degree and assault in the first degree. The defendant now appeals, primarily arguing that he was deprived of his right to a fair trial under the federal and state constitutions because members of Walton's family

were allegedly present in the courtroom wearing T-shirts that bore a photo of Walton and the words, "Remembering," or "Remember," and Walton's name.

Defense counsel first raised this issue to the trial court just prior to the prosecutor's summation, stating that "three members of the Walton family [were] sitting with shirts saying 'Leo Walton,' the deceased's photo, and it says 'Remembering Leo Walton' in clear view of the jury." The trial court questioned the timing of defense counsel's application, stating that it had noticed that one female had worn a similar shirt on three previous occasions and that the subject spectators had been present in the courtroom prior to defense counsel's summation. Defense counsel replied that he did not believe that anyone had worn the shirts "before today."

The trial court denied defense counsel's application to have the Walton family removed, or to have them change their T-shirts. The trial court described the subject T-shirts: "the shirts that they are wearing, which appears from my vantage point to be a white tee-shirt with an embossed or screened some kind of rectangle. And I made out it says 'Remembering Leo Walton.'" The court stated that "[t]he family members of the deceased [were] being seated quietly, innocuously in the audience" and they had not "drawn attention to themselves nor [had] they drawn attention to the shirts." The court concluded that the conduct of the Walton family was not "prejudicial" and did not "impact[ ] the defendant."

After the jury returned its verdict, but before the defendant was sentenced, the defendant moved to set aside the verdict pursuant to CPL 330.30, arguing, inter alia, that he was entitled to a new trial since there was a danger that the jury had been influenced by the T-shirts worn by Walton's family. In support of the motion, which was argued and decided at the sentencing proceeding, defense counsel stated that

> "the verdict was possibly influenced by improper conduct; namely, that four members of the deceased's family sat quite close to the jury with tee-shirts with photos of the deceased and wording that said 'Remember Leo Walton.' And I believe that was an improper effort to elicit sympathy from the jury in deciding the case."

Defense counsel continued:

> "Certainly, it's a public courtroom; members of the deceased's family are certainly entitled to appear.

But I think when it gets to the point of a full body-length photo of the deceased, and 'Remember Leo Walton' at the stage when the jury is hearing summations, charge, and deliberating, that that then leads to the jury making a decision based on sympathy and not on the evidence."

The prosecutor opposed the motion, stating that "[t]his was grieving family sitting in an open courtroom and listening politely and carefully to the evidence that their loved one was murdered." The prosecutor stated that the family had been "extraordinarily composed [and] respectful . . . throughout the entire process" and that at no time did anyone act to direct attention to the shirts.

The Supreme Court denied the defendant's CPL 330.30 motion. The court stated that "it would be appropriate to make a better record of what the shirt was. It was [a] white tee shirt with a silk screen with a picture of the deceased with some written language on it." The court stated that the shirts "weren't inflammatory." The court had "noticed that shirt" previously, but it "couldn't read what was written on it." The court stated that the members of the Walton family "sat in the second row of the audience" and that the T-shirts were "not flauntily [sic] displayed in front of the jury, nor . . . did any members of the family bring undue attention to [them]." The court further stated that "most of the members of the family had an outer garment on top of the tee-shirt" so that the jury "wasn't even capable of seeing the entire thing." The court noted that "[w]hen counsel made the objection, [it] responded and made a record at that time indicating that [it] saw nothing wrong with those shirts." The court concluded that the conduct of Walton's family had "not inflamed" the jury.

A criminal defendant's right to a trial by an impartial jury is guaranteed by both the federal and state constitutions (*see* US Const Sixth Amend; NY Const, art I, § 1). "The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury" (*Turner v Louisiana*, 379 US 466, 472 [1965] [internal quotation marks omitted]). "[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial" (*Taylor v Kentucky*, 436 US 478, 485 [1978]).

In order to safeguard the constitutional guarantees of impartiality and to ensure that a jury's verdict is based solely

on the evidence formally admitted as proof, courts go to great lengths to screen out prospective jurors that possess characteristics which may impact a juror's ability to be impartial (*see* CPL 270.20 [1] [b]), to prevent jurors from "convers[ing] among themselves or with anyone else upon any subject connected with the trial" (CPL 270.40), to prohibit jurors from "read[ing] or listen[ing] to any accounts or discussions of the case reported by newspapers or other news media" (*id.*), to restrict the admission of evidence that may affect the jury's ability to resolve the case on the evidence alone (*see People v Stevens*, 76 NY2d 833, 835 [1990]; *People v Donohue*, 229 AD2d 396, 398 [1996]), and to shield jurors from other "improper influence[s]" (*People v Brown*, 48 NY2d 388, 393 [1979]).

These safeguards, so scrupulously observed in every criminal proceeding, lose all purpose if the atmosphere in the courtroom itself affects the ability of the jurors to remain impartial. Indeed, a trial free from a "coercive . . . atmosphere" is a "fundamental principle of due process [that] is well established" (*Carey v Musladin*, 549 US 70, 80 [2006]; *see Moore v Dempsey*, 261 US 86 [1923]; *Frank v Mangum*, 237 US 309 [1915]). It has long been recognized in this State that such an atmosphere of coercion may arise through the conduct of spectators: "[i]t is not to be tolerated that men [or women] should go into such a place and manifest their feelings, prejudices or passions, for the purpose of exerting an influence upon those who sit in judgment upon the rights of parties" (*Conrad v Williams*, 6 Hill 444, 452 [1844]).

However, "[t]he safeguards of juror impartiality . . . are not infallible [and] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote" (*Smith v Phillips*, 455 US 209, 217 [1982]). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen" (*id.* at 217).

A trial court, which is in the best position to detect and evaluate the danger that spectator conduct may present to the integrity of the trial process, has a constitutional duty to monitor the atmosphere of the courtroom to ensure that the jury is not exposed to spectator conduct that poses a coercive threat to the jury's ability to remain impartial (*see* US Const Sixth Amend; NY Const, art I, § 1; *accord Carey v Musladin*, 549 US 70 [2006]). When such conduct is detected, a court must act immediately to minimize its impact on the jury.

In a close case, the most prudent course is to err on the side of caution rather than test the outermost bounds of constitutionality, since the minor inconvenience imposed upon spectators by limiting the scope of their conduct cannot reasonably be compared to the importance of providing the accused with his or her right to a trial by a jury unencumbered by the threat of coercive influences. The trial court's failure to adhere to such a course in this case is troubling, as is the indication in the record that it was aware of the subject T-shirts three days before defense counsel raised the issue, but failed to alert counsel or otherwise inquire into the situation. The better course would have been to immediately inform Walton's family members that their conduct could potentially imperil the legitimacy of the trial, and give them an opportunity to voluntarily acquiesce to defense counsel's request, thus obviating the need for explicit direction from the trial court.

However, to the extent that the defendant urges us to impose a per se rule that would require reversal whenever a spectator brings a depiction of a deceased victim into a courtroom, we decline to do so (see People v Thompson, 34 AD3d 852, 854 [2006]). We agree that "one could not seriously deny that allowing spectators at a criminal trial to wear . . . the victim's photo can raise a risk of improper considerations," since such depictions "are at once an appeal for sympathy for the victim . . . and a call for some response from those who see them" (Carey v Musladin, 549 US at 82-83 [Souter, J., concurring]; cf. People v Stevens, 76 NY2d at 835; People v Donohue, 229 AD2d at 398). We nevertheless conclude that a per se rule is inappropriate. Given the innumerable variations of conduct that may arise in and among court spectators, and the varying degrees of impact such conduct may have on a jury, each particular instance of challenged conduct calls for a sui generis determination of its potential effect on the jury, made in light of the particular circumstances of the case (see People v Thompson, 34 AD3d at 854; accord Carey v Musladin, 549 US at 83 [Souter, J., concurring]; Johnson v Commonwealth, 259 Va 654, 676, 529 SE2d 769, 781-782 [2000]; Cooper v Commonwealth, 2004 WL 1876416, 2004 Va App LEXIS 403 [2004]; Nguyen v State, 977 SW2d 450, 457 [Tex App 1998], affd 1 SW3d 694 [Tex Crim App 1999]; State v Braxton, 344 NC 702, 477 SE2d 172 [1996]; Cagle v State, 68 Ark App 248, 6 SW3d 801 [1999]; State v Bradford, 254 Kan 133, 864 P2d 680 [1993]; Kenyon v State, 58 Ark App 24, 946 SW2d 705 [1997]).

Accordingly, whether any particular conduct, or a court's response to it, has violated a defendant's right to an impartial jury, depends on the particular circumstances of each case (*compare Moore v Dempsey*, 261 US 86 [1923], *with Carey v Musladin*, 549 US 70 [2006]). Such circumstances may include the nature of the crime and the evidence adduced at trial, the nature of the spectator conduct, and the degree to which the jury was exposed to such conduct. It is not necessary for an actual prejudicial effect on the jury to be established (*cf. Holbrook v Flynn*, 475 US 560, 570 [1986]). Ultimately, "the question is whether the [spectator conduct] presents an unacceptable risk . . . of impermissible factors coming into play in the jury's consideration of the case" (*Carey v Musladin*, 549 US at 82 [Souter, J., concurring] [internal quotation marks omitted]; *cf. Holbrook v Flynn*, 475 US at 570).

Here, the Supreme Court concluded that the conduct of the Walton family in wearing the subject T-shirts did not pose a threat to the ability of the jury to remain impartial and to decide the case on the evidence alone. The court's determination was based upon, inter alia, its conclusion that the T-shirts were not themselves inflammatory and that Walton's family members did not conduct themselves in a manner that would draw the jury's attention to the T-shirts. The court further determined that the jury was not even capable of seeing the T-shirts in their entirety, since the individuals were sitting in the second row and were wearing other garments over them. The court's conclusion that the T-shirts were not prominently displayed is also reflected by the fact that defense counsel did not raise an objection to the T-shirts until he noticed them. To the extent that the defendant takes issue with the court's descriptions of the exact nature of the T-shirts, their visibility to the jury, and the length of time that the jury was exposed to them, he failed to create a record that would provide a basis for this Court to overturn those factual findings. Upon this record, we are unable to conclude that the Supreme Court's determination, that the spectator conduct did not threaten the ability of the jury to remain impartial, was error (*see People v Thompson*, 34 AD3d at 854; *accord Carey v Musladin*, 549 US 70 [2006]).

Turning to the remaining issues raised on appeal, we find the defendant's contention that he was deprived of his right to the effective assistance of counsel under the federal or state constitution to be without merit (*see Strickland v Washington*, 466 US 668 [1984]; *People v Baldi*, 54 NY2d 137 [1981]).

The defendant additionally contends that he was deprived of a fair trial due to the cumulative impact of certain improper comments the prosecutor made on summation. However, the defendant's contention is unpreserved for appellate review (*see* CPL 470.05 [2]), because he failed to object to the comments he now challenges (*see People v Romero*, 7 NY3d 911, 912 [2006]), or failed to request additional relief when the Supreme Court sustained objections or provided curative instructions (*see People v Heide*, 84 NY2d 943, 944 [1994]; *People v Bajana*, 82 AD3d 1111, 1112 [2011]; *People v Damon*, 78 AD3d 860 [2010]; *People v Hollenquest*, 48 AD3d 592, 593 [2008]), and we decline to review it in the exercise of our interest of justice jurisdiction (*see* CPL 470.15 [3] [c]).

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80 [1982]).

Accordingly, the judgment is affirmed.

DICKERSON, J. (dissenting). In April 2008, the defendant was charged by indictment with murder in the second degree, attempted murder in the second degree, assault in the first degree, and criminal possession of a weapon in the second degree (two counts). According to the evidence presented by the People at trial, Mark Maldonado knew the defendant from "doing little things together, making money, little hustles here and there." In September 2007, Maldonado and the defendant were jailed in Toms River, New Jersey. Maldonado was incarcerated for approximately two weeks, after which he was released on bail. In March 2008, after the defendant was released, Maldonado saw the defendant, who accused Maldonado of allowing him to languish in jail. The defendant was very unhappy with Maldonado. Approximately one week later, Maldonado saw the defendant again. The defendant indicated that he had nowhere to go, and Maldonado offered to allow the defendant to sleep on the couch in the apartment Maldonado shared with Leo Walton. They went to the apartment, and Walton was home. After Maldonado served the defendant a drink, Maldonado went into his bedroom with his girlfriend, closed the door, and locked it. Approximately 15 to 20 minutes later, Maldonado heard three gunshots. The defendant then kicked Maldonado's bedroom door open and shot Maldonado four times. The defendant ran out of the room. Maldonado survived the shooting. Walton died as a result of three gunshot wounds to the back of his head.

At trial, the defense advanced a justification argument. This position was supported, according to the defense, by the writ-

ten statement the defendant gave to law enforcement officials, in which he stated that he was in the apartment when Maldonado emerged from a hallway and fired shots from a handgun. The defendant stated that he dove to the floor while the gunshots fired by Maldonado "hit the next guy." The defendant pulled his own handgun from his waistband, followed Maldonado to his room, and fired four rounds.

A jury convicted the defendant of murder in the second degree and assault in the first degree. The Supreme Court sentenced the defendant to consecutive terms of imprisonment of 25 years to life, to be followed by five years of postrelease supervision.

Among the defendant's claims on appeal, he asserts that he was deprived of his right to a fair trial due to prejudicial conduct by spectators in the courtroom. Specifically, several members of Walton's family, who were seated in relatively close proximity to the jurors, wore T-shirts bearing a likeness of Walton and the words "Remember Leo Walton," or "Remembering Leo Walton." The defendant claims that this display was a highly prejudicial, and ultimately successful, attempt to elicit sympathy for Walton and inflame the passions of the jury. The defendant asserts that it was reversible error for the trial court to deny his attorney's application to minimize any undue prejudice by having the family members cover or remove the T-shirts. Because I agree, I respectfully dissent.

"The constitutional guarantee to due process of law provides criminal defendants with 'the fundamental right to a fair trial'" (*People v Henriquez*, 3 NY3d 210, 214 [2004], quoting *Strickland v Washington*, 466 US 668, 684 [1984]). Indeed, the right of the accused to a fair trial, before an impartial jury of his or her peers, at which the verdict is rendered solely on the basis of the evidence admitted without regard to improper or extraneous considerations, is a cornerstone of a just society.

The essential elements of a criminal defendant's right to a fair trial "are defined primarily by the Sixth Amendment" (*People v Henriquez*, 3 NY3d at 214), which provides, in part,

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . , and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to

have the Assistance of Counsel for his defence" (US Const Sixth Amend).

The New York Constitution also grants defendants the fundamental right to a fair trial (*see* NY Const, art I, § 6).

> "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial' " (*Holbrook v Flynn*, 475 US 560, 567 [1986], quoting *Taylor v Kentucky*, 436 US 478, 485 [1978]).

"[C]ertain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny' " (*Holbrook v Flynn*, 475 US at 568, quoting *Estelle v Williams*, 425 US 501, 503-504 [1976]).

In a case such as this, the question to be resolved is whether permitting the family members of the deceased to display their "memorial" T-shirts in the courtroom at the trial of the accused "was so inherently prejudicial that [the defendant] was thereby denied his constitutional right to a fair trial" (*Holbrook v Flynn*, 475 US at 570). "Whenever a courtroom arrangement is challenged as inherently prejudicial . . . , the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play' " (*id.*, quoting *Estelle v Williams*, 425 US at 505; *see People v Tohom*, 109 AD3d 253, 268 [2013]).

I agree with my colleagues' pronouncement that

> "[i]n a close case, the most prudent course is to err on the side of caution rather than test the outermost bounds of constitutionality, since the minor inconvenience imposed upon spectators by limiting the scope of their conduct cannot reasonably be compared to the importance of providing the accused with his or her right to a trial by a jury unencumbered by the threat of coercive influences."

Moreover, I agree with my colleagues' determination that a per se rule compelling reversal in every case involving such a display is not tenable. To draw a parallel, in addressing an-

other fair trial right, that implicated by prejudice to defendants resulting from pre-indictment delay, the United States Supreme Court observed that, "[t]o accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases" (*United States v Marion*, 404 US 307, 325 [1971]). The rejection of a per se rule is logically consistent with the differing results in cases involving in-court displays such as those at issue here (*compare People v Thompson*, 34 AD3d 852, 853-854 [2006], *with People v Levandowski*, 8 AD3d 898 [2004]).

I disagree with my colleagues, however, as to the ultimate determination here based on the facts and circumstances of this case.

Following defense counsel's summation, he requested a sidebar conference. At this conference, defense counsel stated that he observed three of Walton's family members in the audience wearing the "memorial" T-shirts in view of the jury. Defense counsel requested no more than that the court direct these individuals to change their shirts, asserting that the shirts were an effort to inflame and influence the jury. The People objected to the defense's request. The court stated that it did not deem the T-shirts to be prejudicial. The court noted that the individuals wearing the shirts had been quiet and orderly, and had not drawn attention to themselves or their shirts. The court described the T-shirts for the record. According to the court, the family members had worn the shirts in the courtroom on several occasions. Observing that defense counsel did not previously object, the court stated,

> "I find now it would just be a tactical move on the part of counsel, strategically, to bring attention to it by having these people asked to change or leave the courtroom immediately before his adversary is going to sum up. So I find this to be a disingenuous type of argument at this time. And I am not going to instruct them to do anything."

Defense counsel disagreed, stating that he did not believe anyone had worn the shirts on previous days in the courtroom. The court responded,

> "You're incorrect, counsel. I am making the record. I'm finding as a matter of fact that one of the

females has worn this shirt for at least three court dates that I've seen her with. And these individuals had these shirts on this morning before the jury came in while counsel was free to walk around the courtroom. They were in plain sight where no one attempted to cover them up. So, counsel, your statement of facts [is] incorrect. Step out."

After the defendant was convicted and immediately prior to sentencing, the Supreme Court heard defense counsel on the defense motion pursuant to CPL 330.30 to set aside the verdict on the ground, among others, that the T-shirts deprived the defendant of his due process right to a fair trial. Defense counsel acknowledged that members of the deceased's family were, of course, entitled to appear in open court. However, defense counsel opined that permitting them to wear T-shirts bearing a large image of Walton with the text, "Remember Leo Walton" would "lead[ ] to the jury making a decision based on sympathy and not on the evidence."

The court denied the defense's CPL 330.30 motion. With regard to the ground at issue here, the court stated,

> "the jury was not inflamed by the simple wearing of the tee-shirts by members of the decedent's family. They sat in the second row of the audience. I noticed one of the grieving members of the family wearing the shirt for several times.

> "I guess now it would be appropriate to make a better record of what the shirt was. It was [a] white tee shirt with a silk screen with a picture of the deceased with some written language on it.

> "I had noticed that shirt, couldn't read what was written on it. It was not flauntily [sic] displayed in front of the jury, nor in any way did any members of the family bring undue attention to it.

> "In fact, most of the members of the family had an outer garment on top of the tee-shirt. So it wasn't even capable of seeing the entire thing.

> "When counsel made the objection, I responded and made a record at that time indicating that I saw nothing wrong with those shirts. In addition, they weren't inflammatory, and a member of the decedent's family had worn that on prior occasions."

Contrary to the opinion of my colleagues in the majority, I find that the record, set forth above, is more than adequate to conclude that these circumstances deprived the defendant of his fundamental right to a fair trial. Moreover, where the Supreme Court denied defense counsel's application, characterized the application as strategic and disingenuous, insisted on making its own record of the relevant circumstances, and thereafter terminated the sidebar conference by directing counsel to step out, I am reluctant to fault the defense for failing to make a better record for our review.

On this record, I conclude that the memorial T-shirts worn by several members of the victim's family during trial, in view of the jury, presented " 'an unacceptable risk . . . of impermissible factors coming into play' " in the jury's verdict (*Holbrook v Flynn*, 475 US at 570, quoting *Estelle v Williams*, 425 US at 505). The Supreme Court stated, in denying defense counsel's application following his summation, that family members had worn the shirts on several occasions, and that one family member had worn the shirt on at least three court dates. At sentencing, the court stated that it had observed these T-shirts worn by family members "several times." In asserting that defense counsel could have objected to the T-shirts earlier, the court noted that the family members "had these shirts on this morning before the jury came in while counsel was free to walk around the courtroom. They were in plain sight where no one attempted to cover them up." Prior to sentencing, the court noted that the family members wearing the T-shirts sat in the second row of the audience during trial. It is undisputed that the T-shirts bore a large image of the deceased, with the words "Remember Leo Walton," or "Remembering Leo Walton."

The record demonstrates that the jury was exposed to the T-shirts, perhaps over the course of several days. Moreover, with regard to the content or substance of the message conveyed by the T-shirts, as Justice Souter stated in concurring with the judgment in *Carey v Musladin* (549 US 70 [2006]), a case involving a similar display,

> "one could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations. The display is no part of the evidence going to guilt or innocence, and the buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and

a call for some response from those who see them. On the jurors' part, that expected response could well seem to be a verdict of guilty, and a sympathetic urge to assuage the grief or rage of survivors with a conviction would be the paradigm of improper consideration" (*id.* at 82-83 [Souter, J., concurring]).

In my opinion, the risk of prejudice to the defendant, the risk that the jury's verdict would be rendered based, in part, on improper considerations, is too great in this case. I conclude that the facts at issue in this case gave rise to an unacceptable risk that impermissible factors would come into play in the jury's verdict (*see Holbrook v Flynn*, 475 US at 570; *Estelle v Williams*, 425 US at 505).

The Supreme Court's conclusory pronouncement that "the jury was not inflamed by the simple wearing of the tee-shirts by members of the decedent's family" is insufficient to allay doubts as to whether the defendant's fundamental right to a fair trial was properly safeguarded. Of course, the trial judge had no knowledge of whether the jury was or was not affected by the display. Moreover, the issue is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play' " (*Holbrook v Flynn*, 475 US at 570, quoting *Estelle v Williams*, 425 US at 505). Additionally, the unacceptable risk of impermissible factors entering into the jury's determination could hardly be said to be cured by the fact that the victim's family members were quiet and orderly, and did not "flauntily [sic]" display the shirts.

Because I find the unacceptable risk that improper considerations contributed to the jury's verdict was too great, and therefore it cannot be said with any certainty that the defendant was afforded his constitutionally guaranteed right to a fair trial, I would reverse the judgment and order a new trial.

Accordingly, I respectfully dissent based on this ground. In all other respects, I agree with my colleagues in the majority.

BALKIN, J.P., and ROMAN, J., concur with MILLER, J.; DICKERSON, J., dissents and votes to reverse the judgment and order a new trial.

Ordered that the judgment is affirmed.