IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,348

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER C. HARRIS,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial if there was prejudicial conduct inside or outside the courtroom that makes it impossible to proceed without injustice to a defendant or the prosecution. To follow the statute, the court engages in a two-step analysis: (a) decide whether some fundamental failure occurred in the proceeding, and (b) if so, determine whether it is possible to continue without injustice. This second step requires assessing whether the prejudicial conduct's damaging effect can be removed or mitigated through jury admonition or instruction. If that is not possible and the degree of prejudice would result in injustice, a mistrial is necessary.

2.

Under K.S.A. 22-3501(1), a court may grant a defendant's motion for new trial if required in the interest of justice.

3.

When based on a claimed trial error adversely affecting a defendant's fair trial right, a motion for mistrial under K.S.A. 22-3423(1)(c) and a motion for new trial under K.S.A. 22-3501(1) essentially ask the same question, i.e., whether the challenged event

1

deprived the defendant of a fair trial. An appellate court applies the same abuse of discretion standard when reviewing a district court's answer to that question.

4.

An appellate court reviews an instructional error claim in multiple steps. First, the court decides whether the issue was properly preserved below. Second, it considers whether the instruction was legally and factually appropriate. In doing so, the court exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party. And when the reviewing court finds error, it determines whether that error is reversible.

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed May 14, 2021. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson*, of the same office, was with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  Christopher C. Harris appeals from his convictions for attempted capital murder, aggravated robbery, aggravated assault, and criminal possession of a firearm following a convenience store robbery and manhunt during which he shot a Topeka police detective. Harris argues a contingent of 15 to 20 police officers poisoned the proceedings when they entered the courtroom in an apparent show of support for the prosecution just as the jury was about to receive its instructions and deliberate. He also claims reversible error occurred when the district court denied his requested jury

2

instructions on self-defense and attempted voluntary manslaughter, and when the prosecutor made remarks Harris considers prejudicial during closing argument. We reject these challenges and affirm the convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Around 6:30 p.m. on November 5, 2016, a man dressed in all black and wearing red shoes entered a Topeka convenience store, pointed a handgun at the cashier, and said, "'Give me all the fucking money, or I'm gonna kill you.'" The clerk handed over the cash in the register. The man got into a blue PT Cruiser, and the car drove off. The cashier called 911.

Around 6:37 p.m., a nearby police officer heard a radio dispatch about the robbery and spotted a blue car matching the description. The officer followed until the car pulled into a driveway. The driver and passenger got out and ran. Other officers arrived and apprehended the driver. The passenger got away.

Detective Brian Hill assisted but then decided to go to the law enforcement center to interview the driver. Hill drove an unmarked vehicle with interior mounted emergency lights. He wore slacks and a dark colored shirt. His badge was on his duty belt with his firearm, handcuffs, and two ammunition clips. He spotted a man matching the robber's description.

At trial, Hill testified he stopped, turned on his emergency lights, and stepped out of the car. He shined his flashlight on the man, identified himself as a police detective, and asked if they could talk. As the man approached, he drew a gun and shot at Hill, striking him several times. The detective returned fire and the man fled. The first backup officer on the scene testified he "saw muzzle flash between [Hill] and [Harris.]" The

3

officer said he also shot at the fleeing man from his car window and was "fearful" at that moment but was "not sure" if Harris ever turned to point a gun at him. Other officers quickly arrived and got the wounded detective to a hospital.

Police soon found Harris lying in a nearby alley with multiple gunshot wounds. They took him into custody and to a hospital. The State charged him with one count of attempted capital murder, one count of aggravated robbery, two counts of aggravated assault—one for the cashier and another for the first backup officer on the scene during the shooting—and one count of criminal possession of a firearm. A jury convicted Harris of all but the aggravated assault of the backup police officer.

Harris directly appeals to this court, raising these trial errors: (1) the district court abused its discretion concerning the officers' sudden courtroom presence by denying a mistrial and a postconviction motion for a new trial; (2) the court committed reversible error by denying his requested jury instructions on self-defense and attempted voluntary manslaughter; and (3) the prosecutor committed reversible error during closing by misstating the law and commenting about Harris not testifying.

Our jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2020 Supp. 22-3601); K.S.A. 2020 Supp. 22-3601(b)(4) (off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 2020 Supp. 21-5401(c) ("[A]ttempt to commit capital murder is an off-grid person felony.").

MISTRIAL AND THE MOTION FOR NEW TRIAL

When the State first began presenting evidence, defense counsel objected to having uniformed police officers in the courtroom. Counsel argued this gave the false

4

impression Harris was dangerous and required more security and also showed sympathetic support for Hill as a fellow officer. Counsel added there was no objection if out-of-uniform officers observed. The court dismissed this concern, saying it had seen just two officers so far, and only one was in the courtroom at a time. The court ruled this was not "unduly prejudicial" but acknowledged it would reconsider if a greater police presence occurred.

Nothing more happened until just before the court was about to read the instructions to the jury. That is when police officers, some in uniform and some in plain clothes, entered after the jury was seated. The following colloquy occurred at the bench:

"[Defense]: I'm going to object to having several uniformed officers in here. There's a few more coming in.

. . . .

"[Prosecutor]: It's an open courtroom, and it's an open proceeding. . . . [T]his does involve an officer, as the victim in this case.

"[Defense]: This will strictly sway the jury. It is not appropriate to have uniformed police officers in here. If they want to put on street clothes, fine.

"THE COURT: Counsel, it's too much. If . . . it were a sex case with a child victim, I would require any persons with any display of sympathy to be removed. And I know this is a heated case, it's an officer involved shooting.

"Officers are in the courtroom in uniform filling up half the [courtroom]. I believe Detective Hill can stay. And the ones in plain clothes can stay, but . . . .

"[Prosecutor]: Is the Court going to make that announcement?

5

"THE COURT: That will bring it to the attention of the jurors then.

"[Defense]: Maybe they could go back in the jury room?

"THE COURT: . . . [T]he situation that we're in now . . . that they're here, if I make any kind of display of asking them to leave, that's gonna [draw attention], more than otherwise. . . . I think a lot of them . . . are witnesses. So they're persons that the jury has already seen in uniform.

"[Defense]: I understand that. But it's obvious what's going on here.

"THE COURT: I know. But the question is, whether it would create more of a problem if I asked them all to leave now, or if I just let them stay. And that's going to be a call that the Court's going to have to make in its discretion, in the best interest of your client.

"[Defense]: May I confer with co-counsel?

"THE COURT: I'm going to make—it's my courtroom.

"[Defense]: I understand that. No disrespect to the Court, but whether or not—I mean, because they've already all piled in here—whether or not to request a mistrial. That's what I want to speak with co-counsel about . . . .

. . . .

"THE COURT: Let's read instructions and then you can address your mistrial afterwards.

"[Prosecutor]: Does the Court want me to ask them privately?

6

"THE COURT: I think if they all get up and leave, it's going to be obvious. I don't think this rises to the level of a mistrial. Counsel, . . . would you feel better if the Court asked them all to leave now?

"[Defense]: No, because that will cause attention.

"THE COURT: I completely agree, but—

"[Prosecutor]: Do you want me to ask them?

"THE COURT: I think any act of them leaving at this point would be the same. I go back to the fact that, first of all, the majority of them are witnesses in this case. The jury has seen them before in uniform. There are a number of plain clothed—I only see one, two, three—I can't see behind the TV. I can't see how many there are, but it seems to me that not all of them are in uniform. A lot of them are plain clothed.

"[Defense]: I'm going to—

"THE COURT: They're all clearly officers. Let's proceed, Counsel. If you'll let me—if you want to make a motion later, you can."

After the jury convicted him, Harris moved for a new trial. He described what happened as "dozens of uniformed police officers and detectives [entering] the courtroom and [filling] the gallery on the State's side." He argued, "The strategic plan to pack the courtroom as they did was an obvious[ly] inappropriate display of authority and it violated the defendant's right to a fair trial." The State asserted there was no evidence the officers' presence influenced the verdict, pointing out the jury's acquittal on the aggravated assault charge concerning the backup officer.

7

In its written ruling denying the new trial motion, the court made the following findings:

"About [half] of the officers were in uniform and [the other half] were in plain clothes. Some of the officers . . . had been witnesses during the jury trial. The court and counsel recognized them as officers, and jurors may have also recognized some officers dressed in plain clothes to be officers, but that is not entirely clear. . . . [T]here was no indication at that point that jurors were in any way affected by the presence of law enforcement officers.

. . . .

" . . . [Those officers] sat quietly on the half of the gallery behind the [S]tate. There were no greater than 15-20 officers that walked into the courtroom about the same time. They entered at a time when there was a natural transition of the proceedings. The court had just reconvened the jury and was getting ready to instruct the jury and to hear closing remarks of counsel. There were no outbursts, no overt physical displays by officers. There was no overt 'staring down' of jurors. About half were in uniform and half were not in uniform. Those officers not in uniform wore plain clothes and had a badge on their person as well as their service weapon."

And from this, the court explained:

"The court denied defendant's request to summarily remove all persons in the gallery in front of the jury. The court found that such an exaggerated gesture would create more of a distraction to jurors than simply allowing officers to remain. And while the act of several officers coming in all at once was a distraction, and could have been seen as a display of support for the victim in this case, it did not rise to a level that fundamentally overbore the jury's ability to exercise free will in rendering a fair and independent decision. In fact, the jury had seen a number of the officers throughout the trial because they were witnesses. The jury was well aware from the beginning of the trial that numerous officers were involved in the investigation of the crimes that were alleged."

8

*Standard of review*

At the outset, we should mention the circumstances arguably present three possible analytical paths—K.S.A. 22-3423(1)(c) (mistrial), K.S.A. 2020 Supp. 22-3501(1) (new trial), or both. The statutory language differs, but the practical effect in this instance seems the same. The mistrial statute states: "The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because . . . [p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). The new trial statute provides: "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2020 Supp. 22-3501(1).

Harris' counsel did not formally move for a mistrial when the officers arrived for the jury instruction reading. He contemporaneously objected to their presence but then told the court he wanted to talk with co-counsel about requesting a mistrial. The court seemed to cut this off by signaling it would not grant such a motion, saying: "I don't think this rises to the level of a mistrial."

Counsel revived the issue after the convictions through a new trial motion under K.S.A. 22-3501(1). But in doing so, counsel framed the argument in the mistrial context under K.S.A. 22-3423(1)(c). The court seemingly drew from both statutes as well. In its written decision denying Harris a new trial, the court noted it had earlier ruled "the presence of a number of uniformed and non-uniformed officers entering the courtroom *did not rise to a level of prejudice that would result in an unfair trial that would require the court to declare a mistrial*." (Emphasis added.) And later in its decision, the court held, "And while the act of several officers coming in all at once was a distraction, and

9

could have been seen as a display of support for the victim in this case, it did not rise to a level that fundamentally overbore the jury's ability to exercise free will in rendering a fair and independent decision." In his appellate brief, Harris continues a mistrial focus.

Given these anomalies, we will view the question from both perspectives. After all, there appears to be little practical difference as to whether the officers' presence constituted a fundamental failure in the proceedings that made it impossible to proceed without injustice to the defendant, rather than the incident being so prejudicial to Harris that a new trial is required in the interest of justice. Either inquiry essentially asks the same question, i.e., whether the challenged event deprived Harris of a fair trial. And we apply the same abuse of discretion standard of review when considering the district court's determination. See *State v. Longoria*, 301 Kan. 489, 530, 343 P.3d 1128 (2015). Judicial discretion is abused if a court's action is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law, or (3) based on an error of fact. *State v. Sims*, 308 Kan. 1488, 1496, 431 P.3d 288 (2018).

*Harris was not denied a fair trial.*

When applying K.S.A. 22-3423(1)(c), the court engages in a two-step analysis: (1) "decide whether there was some fundamental failure of the proceeding," and (2) "if so, determine whether it is possible to continue without an injustice." *State v. McCullough*, 293 Kan. 970, Syl. ¶ 4, 270 P.3d 1142 (2012). The first question's analysis varies with the nature of the challenged event "such as when the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial [error], or evidentiary error." *McCullough*, 293 Kan. at 981. The second step requires assessing whether the prejudicial conduct's damaging effect can be removed or mitigated through jury admonition or instruction. "Appellate courts reviewing the second part for an injustice

may take a broader view than the trial court because appellate courts may examine the entire record." 293 Kan. at 981.

Said differently, the burden of showing a fundamental failure is on Harris first, but then the burden would fall on the State to demonstrate the injustice question under *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). In this instance, though, we do not reach that second step because we hold the district court did not abuse its discretion when it decided there was no fundamental failure in the proceedings that could have denied Harris a fair trial.

Central to the fair trial right protected by the Sixth and Fourteenth Amendments to the United States Constitution is the principle that a criminal defendant is entitled to have guilt or innocence determined solely on the basis of evidence admitted at trial. *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). Due process requires that "[t]rials must be free from a coercive or intimidating atmosphere." *Carey v. Musladin*, 549 U.S. 70, 80, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (Kennedy, J., concurring). "Trial courts have a duty to maintain order and ensure that justice is not obstructed by a person or persons. . . . [Courtroom] demonstrations can prejudice a defendant's right to a fair trial." *McCullough*, 293 Kan. at 998. Harris complains about a "coordinated appearance of 15-20 armed law enforcement officers, immediately before instructions and closing argument." And he describes this as "*the actions of spectators—but they were spectators who were clothed with state authority*," as opposed to the actions of officers whose presence was mandated by governmental authorities. (Emphasis added.)

Notably, there is a difference in how these circumstances are viewed when law enforcement is involved. See *Will v. Thaler*, No. H-07-CV-1000, 2010 WL 2179680, at *22 (S.D. Tex. 2010) (unpublished opinion) (distinguishing between the officers'

11

appearance in courtroom for security as directed by a governmental power and the officers' appearance as spectators). The United States Supreme Court has declined so far to establish a federal standard for evaluation of spectator incidents. In *Musladin*, 549 U.S. at 76, the Court held "the effect on a defendant's fair-trial rights of the spectator conduct . . . is an open question in our jurisprudence." And it clarified that the "inherent prejudice" test it created in *Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976), and *Flynn*, 475 U.S. at 570, for the effect of allegedly prejudicial courtroom practices on a defendant's fair trial right—whether the challenged courtroom practice presents "an unacceptable risk . . . of impermissible factors coming into play"— had been applied only to "state-sponsored courtroom practices." *Musladin*, 549 U.S. at 75-76; *Williams*, 425 U.S. 501 (defendant tried in jail attire); *Flynn*, 475 U.S. 560 (supplementing the customary courtroom security force by four uniformed state troopers).

Harris argues the challenged courtroom event inherently prejudiced him. But an inherent prejudice test is applicable only to state-sponsored practices. See *Musladin*, 549 U.S. at 76 ("Reflecting the lack of guidance from this Court, lower courts have diverged widely in their treatment of defendants' spectator-conduct claims."); *People v. Ramirez*, 10 Cal. 5th 983, 1014-15, 274 Cal. Rptr. 3d 309, 479 P.3d 797 (2021) (noting the lack of clearly established federal test for spectator conduct); *People v. Nelson*, 27 N.Y.3d 361, 368, 33 N.Y.S.3d 814, 53 N.E.3d 691 (2016) (same). Admittedly, police officers' appearance as spectators "traces the middle ground between the facts confronted in *Flynn*[—in which the State compelled the defendant to stand trial in prison clothes—]and *Musladin*[—in which the victim's family members wore buttons displaying the victim's image]." *Will*, 2010 WL 2179680, at *22. But trial courts are in the better position to decide if the prejudicial conduct complained of violated the accused's right to a fair trial. See *State v. Crum*, 286 Kan. 145, 160, 184 P.3d 222 (2008); *State v. Whitesell*, 270 Kan. 259, 281, 13 P.3d 887 (2000).

A few Kansas cases have dealt with an issue similar to what Harris' trial experienced in a civilian spectator context. Those cases consistently require a showing of actual prejudice. See, e.g., *State v. Speed*, 265 Kan. 26, 48, 961 P.2d 13 (1998) (requiring defendant to provide "evidence that the jurors were in any way affected by the buttons or t-shirts" with victim's photo); *State v. Bradford*, 254 Kan. 133, 134, 142, 864 P.2d 680 (1993) (requiring defendant to offer "evidence that any of the jurors saw or were influenced by the buttons" depicting victim's image); *State v. McNaught*, 238 Kan. 567, 580, 713 P.2d 457 (1986) (requiring proof such as "an affidavit or the testimony of any person that the jurors showed any concern about" spectators wearing "Mother Against Drunk Driving" and "Student Against Drunk Driving" buttons). In the absence of binding federal precedent, in Kansas, the decision to declare a mistrial lies within the trial court's sound discretion and will not be disturbed unless there is a clear showing of abuse of that discretion.

In Harris' case, the court's findings reflect no more than 15-20 officers walked into the courtroom at about the same time when there was a natural transition in the proceedings. Approximately half the officers were in uniform, while the rest were in plain clothes with their badges displayed and their service weapons noticeable. They sat quietly behind the State and made no outbursts or overt physical displays. And the court noted the jury by that stage already had seen a number of the officers testifying as witnesses. It is also relevant that when defense counsel objected to the officers' presence, the court asked if counsel would "feel better" if the court asked them all to leave. Counsel answered, "No, because that will cause attention." Agreeing, the court viewed "such an exaggerated gesture would create more of a distraction to jurors than simply allowing officers to remain."

13

In his brief, Harris merely asserts the court abused its discretion in how it processed the situation at trial when it was dismissive of the notion that a mistrial might be justified. But even though the record lacks some details, like an exact number of the uniformed officers or how many of them testified, what there is remains largely consistent with the trial court's findings. And without more, Harris' arguments lack a basis for more analytical depth under *Speed*, *Bradford*, and *McNaught*. In other words, Harris does not offer evidence the officers' presence had any prejudicial impact.

Harris refers us to a Florida Court of Appeals case, *Shootes v. State*, 20 So. 3d 434 (Fla. Dist. Ct. App. 2009), which he claims is similar to his trial experience. But *Shootes* is distinguishable and a bit of an outlier as the State points out. There, the defendant produced four affidavits from courtroom observers describing the number and appearance of police officers attending a trial at their union's request. The *Shootes* court held the police officers in the gallery presented an unacceptable risk to fairness because of their substantial numbers (between 35 to 70 officers), and because they were not present to testify. 20 So. 3d at 436, 439. But in Harris' case the district court found 15-20 officers attended, and "the majority of them" had already testified as witnesses.

Finally, we note the jury acquitted Harris on the aggravated assault charge concerning the backup officer. Any notion the jury felt pressured by the police contingent in the courtroom, as Harris asserts, is belied by that acquittal.

We hold the district court did not abuse its discretion when it concluded there was no fundamental failure in the proceedings that could deny Harris a fair trial.

Harris requested jury instructions on self-defense and attempted voluntary manslaughter. He now claims reversible error after the district court denied both as factually inappropriate because it determined no evidence existed to show Harris' subjective belief he needed to act in self-defense. We agree with the court.

*Additional background*

At trial, Detective Hill testified he first saw Harris on the sidewalk. He was not sure if Harris was the man he was looking for, so he stopped his car, activated its emergency lights, and stepped out. He shined his flashlight on Harris, identified himself as a police detective, and asked if they could talk. It did not appear Harris had anything in his hands. And as Harris walked towards him, Hill thought he was going to cooperate. But Harris started shooting when they were about 8 feet apart, hitting Hill in both legs, his lower stomach, hip, and elbow. Hill returned fire.

The defense speculated Harris could have been mistakenly acting in self-defense when he fired at the plain clothes detective by disputing whether Hill activated his vehicle's emergency lights. Harris called witnesses to describe what they saw that evening. Karen Valdivia lived nearby. She was in her living room, heard gunshots, and looked out the front door. She testified she did not see any headlights and did not "remember whether there were lights on or not." Joseph Lopez also lived nearby. He heard about four pistol shots while watching television in his bedroom. He looked out his front door but did not see anything. When asked about "any flashing lights," he said: "I can't recall that. I can't recall if I [saw] any flashing lights. For some reason, I'm sure if I would've seen it, I would've remembered, but I can't recall that."

15

Another neighborhood resident, Mayra Rodriguez, saw a man walking down the street with a car slowly following. She went inside and told her parents. Then she heard gunshots, and police started arriving. Jesus Rodriguez, her father, looked out his window when Mayra told him what she saw. At that moment, he heard shots and saw muzzle flashes. He saw a dark-colored car but did not notice anything else about it. Jesus took his family to the back of the house. When he looked out the front again, he saw police vehicles, which he identified because "they're black and white with the sirens and everything." When asked about the dark car he saw earlier, Jesus said "I didn't see any . . . lights."

Contrary evidence came from officers at the scene who testified they saw the detective's car with its emergency lights on. Officer Kyle Jeanneret, the first backup officer to arrive, said he saw Hill's car "with clearly visible red and blue lights on the rear end." He also saw an exchange of gunfire. Officer Timothy Bell testified he noticed the detective's car with its lights activated, which was corroborated by dash camera video. Detective Michael Barron testified he saw Hill's "emergency lights were activated. I saw just the back of it." And Detective Scott Dickey, who retrieved Hill's car the next day, testified both the front and back lights activated when he started the car.

Bullet casings also played a role in Harris' arguments. Investigators found a 9mm SCCY brand pistol at the scene and a SCCY 9mm magazine in the PT Cruiser's glove box. Investigators also discovered three brass casings that apparently belonged to the 9mm SCCY brand pistol—one on the street near the curb, another on the sidewalk, and the other close to the alley garage where police found Harris. The defense claimed these brass casings showed Harris was running away while shooting, which contradicts Hill's account that Harris shot first and then fled.

At the jury instructions conference, the defense claimed the following evidence supported the requested instructions: (1) Officer Jeanneret's testimony he saw an exchange of gun fire; (2) the lack of other evidence corroborating Hill's testimony about who shot first; (3) the brass casings pattern; (4) the possibility Harris did not know Hill was a police officer because he drove an unmarked car and wore plain clothing; and (5) the witness testimony from those who did not recall seeing any emergency lights activated. The State countered that none of this mattered without proof of Harris' subjective belief he needed to defend himself because no other evidence showed what he was thinking at that moment.

The court agreed with the State. It pointed out the defense's theory "only works . . . if there was evidence that Officer Hill shot . . . first." It also noted no evidence indicated Hill acted unlawfully.

*Standard of review*

An appellate court reviews instructional error claims in multiple steps. First, it decides whether the issue was properly preserved below. Second, it considers whether the instruction was legally and factually appropriate. In doing so, the court exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party. And when the reviewing court finds error, it determines whether that error is reversible. If the defendant properly requested the instruction, as Harris did, and a reviewing court also finds the instruction was both legally and factually appropriate, the State must establish there is no reasonable probability the absence of the error would have changed the verdict. The court considers the entire record de novo when deciding whether the State meets its burden. *State v. Randle*, 311 Kan. 468, 471, 462 P.3d 624 (2020); see also *State v. Keyes*, 312 Kan. 103, 107, 472 P.3d 78 (2020) (reasonable probability test for preserved self-defense instructional error claim); *State v. Qualls*, 297

17

Kan. 61, 71, 298 P.3d 311 (2013) (*Qualls I*) (reasonable probability test for preserved voluntary manslaughter instructional error claim); *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011) (reversibility inquiry's test and degree of certainty in detail).

*Discussion*

Our issue is whether both requested instructions were factually appropriate, which depends on whether Harris subjectively believed he was acting in self-defense. The relevant portion of the self-defense statute declares:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person *and such person reasonably believes* that such use of force is necessary to defend such person . . . .

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) *if such person reasonably believes that such use of deadly force is necessary* to prevent imminent death or great bodily harm to such person . . . ." (Emphases added.) K.S.A. 2020 Supp. 21-5222.

This sets out a two-part test: (1) the subjective test requires a showing that a defendant "sincerely and honestly believed it was necessary to kill to defend" themselves; and (2) the objective test requires a showing that a reasonable person in the defendant's "'circumstances would have perceived the use of deadly force in self-defense as necessary.'" *State v. Haygood*, 308 Kan. 1387, 1405, 430 P.3d 11 (2018).

The pertinent portion of the voluntary manslaughter statute provides: "Voluntary manslaughter is knowingly killing a human being committed . . . *upon an unreasonable but honest belief that circumstances existed that justified use of deadly force* under K.S.A. 21-5222." (Emphasis added.) K.S.A. 2020 Supp. 21-5404(a)(2); see also K.S.A.

18

2020 Supp. 21-5301(a) ("An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."). In other words, voluntary manslaughter lacks the objective/reasonable belief requirement—one of two necessary elements for self-defense.

To be entitled to the self-defense instruction, K.S.A. 2020 Supp. 21-5108(c) requires "competent evidence," which is defined as evidence that could allow a rational fact-finder to reasonably conclude that the defense applies. K.S.A. 2020 Supp. 21-5108(c) ("A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence."); *State v. Staten*, 304 Kan. 957, 965, 377 P.3d 427 (2016) (defense theory of self-defense is affirmative defense in Kansas). To be entitled to the attempted voluntary manslaughter instruction, K.S.A. 2020 Supp. 22-3414(3) requires "some evidence." See K.S.A. 2020 Supp. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . , the judge shall instruct the jury as to the crime charged and any such lesser included crime."); *State v. Seba*, 305 Kan. 185, 208, 380 P.3d 209 (2016) ("Imperfect self-defense voluntary manslaughter . . . is a lesser included offense of first-degree intentional murder.").

Both statutes require reasonableness in determining whether a defendant is entitled to such instructions: "reasonabl[e] conclu[sion] that the defense applies" under K.S.A. 2020 Supp. 21-5108(c), and "reasonabl[e] justif[ication for] a conviction of some lesser included crime" under K.S.A. 2020 Supp. 22-3414(3). And our caselaw seems to treat these evidentiary standards similarly. Compare *State v. Qualls*, 309 Kan. 553, 557-58, 439 P.3d 301 (2019) (*Qualls II*) ("Even if the only evidence supporting the defendant's [self-defense] theory consists of the defendant's own testimony, which may be contradicted by all other witnesses and by physical evidence, the defendant may have met

19

his or her burden [under K.S.A. 2020 Supp. 21-5108(c)]."), with *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014) ("[E]vidence need not be strong or conclusive to warrant the [lesser included offense] instruction."); *State v. Nelson*, 291 Kan. 475, 480, 243 P.3d 343 (2010) ("District courts have a duty to issue instructions on any lesser included offense established by the evidence, even if the evidence is weak or inconclusive.").

We hold the district court correctly rejected the requested instructions because no direct or circumstantial evidence supports Harris' subjective belief about self-defense. See *State v. Thach*, 305 Kan. 72, 83, 378 P.3d 522 (2016) (one's subjective state of mind "'may be proved by circumstantial evidence'"); *State v. Gonzalez*, 311 Kan. 281, 288, 460 P.3d 348 (2020) ("Intent is usually proven by inference arising from circumstantial evidence because direct evidence of a defendant's state of mind is rarely available.").

Harris basically argues (1) the unmarked detective car, (2) Hill's plain clothes, (3) Hill's use of a flashlight, (4) the testimony concerning the emergency lights, (5) the multiple gunshots exchanged between Harris and Hill, (6) Harris' injury, and (7) the brass casings positions, taken together, indicate he "sincerely and honestly believed it was necessary to [fire a gun at Hill] to defend himself" under K.S.A. 2020 Supp. 21-5222, and/or that he unreasonably but honestly believed "circumstances existed that justified [his use of] deadly force" against Hill under K.S.A. 2020 Supp. 21-5404(a)(2). But his reasoning is flawed. Points (1)-(4), when viewed in the light most favorable to Harris, may suggest he had reason to be cautious about a stranger following him, but this would not reasonably support a subjective belief he was at risk of imminent death or great bodily harm. And points (5)-(7) relate to events occurring after the shooting began and add nothing to the analysis. The only evidence about who shot first was Detective Hill's statement identifying Harris as the first to fire.

20

Reduced to its base ingredients, Harris simply puts forward hypotheticals to support his requested instructions, i.e., Hill could have shot first. But hypothetical arguments are not considered when reviewing a factual appropriateness claim. See, e.g., *Keyes*, 312 Kan. at 109 (considering defendant's testimony that he "feared for his life when [victim] came at him with a knife threatening to kill him"; holding the self-defense instruction was factually appropriate); *Haygood*, 308 Kan. at 1407 (considering defendant's testimony the victim charged him with a knife after making a threatening statement; holding the self-defense instruction was factually appropriate); *Qualls II*, 309 Kan. at 559 (considering defendant's testimony that he "'was just trying to stop [the victim] . . . [f]rom killing [him]'"; holding the self-defense instruction was factually appropriate); *Qualls I*, 297 Kan. at 70-71 (considering defendant's statement that "he believed [victim] had a gun, so he shot him"; holding the voluntary manslaughter instruction was factually appropriate).

The requested instructions were not factually appropriate. The district court did not err by refusing to give them.

PROSECUTORIAL ERROR

Harris contends reversible prosecutorial error occurred during closing argument on two occasions: (1) when stating the law regarding the elements of attempted first-degree premeditated murder and attempted second-degree intentional murder and (2) when commenting that Harris did not testify. We disagree.

*Standard of review*

The two-step analysis for reviewing prosecutorial error claims is quite familiar by now. In *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), the court declared:

21

"[The] two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'"

*Stating the elements of the lesser included offenses*

When discussing the instructions on the lesser included offenses, the prosecutor said:

"You have been given a lesser included of . . . attempted murder in the first degree. To find the defendant guilty of that, you must decide that the defendant didn't know Detective Hill was a law enforcement officer but he still acted with premeditation.

"You've also been given the lesser included of attempted murder, intentional, second degree. To find the defendant guilty of that offense, you must find that the defendant didn't know he was a law enforcement officer, and he didn't act with premeditation."

Harris claims this misstates the law for both crimes because "[n]either a conviction for first degree murder nor second degree murder contains, as an element, that the defendant did not know the victim was a law enforcement officer." But as the State

22

correctly points out, the comment on the attempted first-degree murder was not wrong. The prosecutor described attempted capital murder and then described its lesser included offenses of attempted first-degree murder and attempted second-degree murder. As to attempted first-degree murder, the prosecutor explained that to find Harris guilty of that offense, the jury "*must decide that the defendant didn't know Detective Hill was a law enforcement officer* but he still acted with premeditation." (Emphasis added.)

This is an accurate statement of law. "Capital murder is the . . . intentional and premeditated killing of a law enforcement officer." K.S.A. 2020 Supp. 21-5401(a)(5). "Murder in the first degree is the killing of a human being committed . . . [i]ntentionally, and with premeditation." K.S.A. 2020 Supp. 21-5402(a)(1). Both offenses must be done with premeditation, but the former requires knowledge of the victim's specific status, while the latter has no such requirement. The comment merely identified the distinction, which was a fair and accurate statement of law.

Harris next contends the prosecutor misstated the victim's status as a law enforcement officer was an element of second-degree intentional murder. The State argues "[n]o reasonable person would have construed [the prosecutor's] statements as meaning the jury had to make affirmative findings of the absence of those two elements." We agree with the State upon looking at the entire argument in context.

At first blush, the prosecutor seemingly directed the jury to affirmatively find the two elements' absence if one focuses on just the statement that: "To find the defendant guilty of [second-degree intentional murder] offense, *you must find that the defendant didn't know he was a law enforcement officer*, and he didn't act with premeditation." (Emphasis added.) Compare K.S.A. 2020 Supp. 21-5401(a)(5) (capital murder of officer), with K.S.A. 2020 Supp. 21-5403(a)(1) ("Murder in the second degree is the killing of a human being committed . . . [i]ntentionally."). But when taken in the fuller context with

23

the prosecutor's closing, the prosecutor seemed to be sequentially explaining the difference in the charges. Although awkwardly spoken, we hold the prosecutor did not misstate the law in context.

*Commenting on a defendant's silence at trial*

Harris next claims the prosecutor erred by drawing the jury's attention to the fact Harris did not testify. The comments were: "There are two eyewitness[es] to his account, Detective Hill, and the defendant. And the only evidence that you heard in this case was that the defendant shot at Detective Hill first," and "[t]he only evidence you have to consider is what Detective Hill told you."

"[P]rosecutors generally err if they comment on a defendant's failure to testify." *State v. Martinez*, 311 Kan. 919, 922, 468 P.3d 319 (2020); see also *State v. Davis*, 255 Kan. 357, Syl. ¶ 1, 874 P.2d 1156 (1994) ("The Fifth Amendment of the United States Constitution forbids comment by the prosecution on the accused's silence."); *State v. Higgenbotham*, 264 Kan. 593, 600, 957 P.2d 416 (1998) (Section 10 of the Kansas Constitution Bill of Rights also protects the accused's exercise of their privilege not to testify); K.S.A. 60-439 ("If a privilege is exercised not to testify . . . the judge and counsel may not comment thereon."). But Kansas courts do not consider a prosecutorial statement in isolation.

Often the line between a prosecutor's permissible and impermissible statement is dependent on the broader context. So courts "ask whether the language used was outside the wide latitude allowed a prosecutor because it was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify or to shift the burden of proof. If so, it is error." *Martinez*, 311 Kan. at 923. If the comment is merely a fair statement that points "'out a lack of evidence to support a

24

defense or to corroborate a defendant's argument regarding holes in the State's case,' it is generally not error." 311 Kan. at 923.

At closing, the defense challenged Detective Hill's credibility and told the jury the only eyewitness to the shooting was Officer Jeanneret. Counsel said,

"*There's really only one eye witness to this entire event, and that's Officer Jeanneret*. . . . Immediately upon arriving there, he saw muzzle flashes; he saw gunfire. He can't say who shot first. He just saw a gun fight . . . .

. . . .

"So we also have to ask of this investigation, *what are we missing?* Officer Jeanneret's body cam. *Officer Jeanneret arrived at the scene before gunshots erupted.* . . . We've watched the body cam footage, it's shaky at best sometimes. But, if there was body cam footage of this event, you would have probably the most crucial piece of evidence you could have to determine what happened." (Emphases added.)

In response, the prosecutor made the statements Harris now complains of. But the prosecutor quite obviously was just pointing out there was an eyewitness who saw Harris shoot first, i.e., Detective Hill, by indicating Jeanneret, who arrived *after* the shooting started, was not an eyewitness, so the jury could consider Hill's testimony. The prosecutor said:

"*Defense argues that there was only one eyewitness to this account. That is not true. Officer Jeanneret was not an eyewitness to what happened at the moment the shooting started. There are two eyewitness to his account, Detective Hill, and the defendant. And the only evidence that you heard in this case was that the defendant shot at Detective Hill first. Officer Jeanneret didn't show up until the shooting already started.*

25

"It doesn't matter when his Axon camera was turned on. That wouldn't have told you anything. It wouldn't have told you anything. It wouldn't have mattered if all the officers had turned their Axon cameras on as soon as they got the call, 1039 to respond, from the moment they started until they got there. It wouldn't have told you anything about what happened on that day. *The only evidence you have to consider is what Detective Hill told you.*" (Emphases added.)

The prosecutor's comments were "'not an impermissible remark about the defendant's failure to testify,'" but rather were "'within the wide latitude afforded to the prosecution.'" *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016).

Affirmed.