■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD BROWN, Appellant. [694 NYS2d 666] —Appeal by the defendant from a judgment of the County Court, Nassau County (Cotter, J.), rendered August 26, 1997, convicting him of robbery in the first degree, robbery in the second degree, and criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant was convicted of crimes arising from a knife-point robbery. On appeal, he argues, *inter alia,* that a variety of errors and excessive intervention by the court warrant reversal of his conviction and a new trial. We disagree and affirm.

In December 1996 the complainant, then sixteen years old, was approached by two men as he walked to school. The complainant described the taller of the two men as, *inter alia,* approximately five-feet, eleven-inches tall, in his mid-twenties, with a dark complexion and shoulder-length braided hair (dreadlocks), and wearing a baseball cap. He described the shorter of the two men as, *inter alia,* a black male, also in his mid-twenties, with a West Indian accent, short hair, and a scar on his right cheek. The shorter man asked the complainant for directions. When the complainant turned to point, the taller man produced a knife, held it to the complainant's throat, and pushed him onto a nearby car. As the taller man restrained him, the shorter man rifled the complainant's pockets and stole three dollars, all that he possessed. The two men made their escape after the tall man punched the complainant in the stomach and he fell to the ground. Although the complainant, after

viewing over 100 photographs, identified a picture of the defendant as being the taller of his two assailants, he was unable to select the defendant out of a lineup held some months later and no in-court identification was permitted. Rather, the complainant was limited to describing his assailants.

Based on the complainant's initial photographic identification of the defendant, the defendant was picked up by the police for questioning. When initially asked, the defendant denied that he was even in the area of the robbery at the time at issue. However, he soon admitted that he was not only in the area, but also, that he had been present at the robbery, which he claimed, was committed by a former acquaintance from high school. The defendant stated that his former acquaintance, who had a scar on his left cheek, had put a knife to the complainant's throat and pushed him up against a car. However, the defendant denied that he possessed the knife or that he had participated in the robbery, although he admitted that he pocketed two dollars that "fell" to the ground during the robbery. The defendant's statement was reduced to writing and signed by him. The officers who questioned the defendant testified that at the time the defendant gave his statement, he had not been told that the other assailant had a scar on his cheek, that a knife had been used in the robbery, that the victim had been pushed against a car, or the amount of money that was stolen.

Viewing the evidence in a light most favorable to the prosecution (*see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see,* CPL 470.15 [5]). In addition, the sentence imposed was neither harsh nor excessive (*see, People v Suitte,* 90 AD2d 80).

The defendant argues that a new trial is warranted because the Trial Judge improperly expressed his personal opinion concerning critical issues of fact, interjected himself excessively into the proceedings, and denigrated counsel in front of the jury. Although the defendant cites to several instances in the record which he argues demonstrate that the Trial Judge failed to maintain his neutrality, he relies on an exchange that occurred during the testimony of a witness for the prosecution, Detective Berrotte, an investigating officer on the case. However, when examined in context, we disagree with the defendant and the dissent herein that either that exchange, or any of the other instances cited, alone or in the aggregate, constitute improper conduct and warrant a new trial.

The defendant's theory at trial was that he had been misidentified after an essentially random arrest by "callous members of the police department who really don't give a damn, and in fact arrested the wrong man and got the wrong man to sign a statement". Critical to the defense theory of mistaken identity were various discrepancies between the complainant's testimony at trial and a signed written statement by the complainant prepared by the first police officer to interview the complainant, Officer Quadrapani. The statement was incorporated into a police report, but neither the report nor the written statement was admitted into evidence at trial. According to the written statement prepared by Quadrapani, *inter alia*, the taller, not the shorter assailant, had the Jamaican accent and was the one who had asked for directions, and the taller assailant had a light, not a dark, complexion.

During the cross-examination of Detective Berrotte, one of the police officers who had questioned the defendant and obtained his written statement, defense counsel made repeated efforts to bring out discrepancies between the complainant's testimony at trial and the complainant's written statement, and between the complainant's testimony and written statement and the defendant's written statement. However, before such questioning, it was established that Berrotte had not taken the complainant's written statement, had not been present when the statement was made, and had not discussed the facts of the robbery with the complainant. Further, the complainant, during cross-examination, expressly denied that he had been the source of the conflicting information contained in the written statement prepared by Quadrapani. Accordingly, the court properly directed defense counsel to limit his questioning of Berrotte to any discrepancies between the complainant's testimony at trial and any statements that the complainant had made to Berrotte, or between such testimony at trial and the defendant's written statement. However, despite such a ruling, and despite Berrotte's lack of personal knowledge concerning the complainant's written statement, which was not in evidence, defense counsel made repeated efforts to question Berrotte concerning the complainant's written statement. Further, at various points, defense counsel, in an apparent effort to avoid further objection and to circumvent the court's ruling, simply asked questions that failed to distinguish between the complainant's testimony at trial and his written statement. It was only after such repeated disregard for its instructions that the court, in sustaining yet another objection by the prosecutor, stated:

"[The complainant] very clearly testified that the man with the braids didn't have an accent, the other one did.

"Now you have constantly referred to a statement or some report by Quadrapani where Quadrapani either wrote down what [the complainant] said to him differently than [the complainant] testified to here.

"Or Quadrapani made a mistake when he wrote it down.

"But please [the complainant] clearly testified that the man with the Jamaican accent was the shorter man, the man with the shorter hair. Now you're mischaracterizing the testimony. I'm submitting that you are doing it at this point multiple times and I want you to either discontinue this line of questioning or ask the questions appropriately".

Given the context in which the objected to exchange occurred, it is clear that the court intervened to maintain order, clarify evidence, and ensure a fair trial (*see, People v Yut Wai Tom,* 53 NY2d 44; *People v Moulton,* 43 NY2d 944; *People v De Jesus,* 42 NY2d 519; *People v Hinton,* 31 NY2d 71, *cert denied* 410 US 911; *People v Foster,* 211 AD2d 640). Further, given the context, and in light of the overall aggressive and confrontational style employed by defense counsel throughout the proceedings, the court's comments were proportionate and did not create an appearance or taint of partiality. They did not constitute unnecessary or excessive interference in the presentation of proof or the denigration of counsel (*see, People v De Jesus, supra; People v Hernandez,* 137 AD2d 560; *People v Dunlap,* 119 AD2d 766). To the extent that the court improperly suggested a possible resolution of a factual issue concerning the source of the discrepancies between the complainant's testimony at trial and his written statement—i.e., a mistake by Quadrapani—the court issued a curative instruction (*see, People v Simms,* 222 AD2d 622). In sum, it cannot be said that the conduct of the court, either here or elsewhere during the trial, alone or in the aggregate, prevented the jury from reaching an impartial verdict (*see, People v Moulton, supra*).

Further, we disagree with the defendant and the dissent herein that various allegedly erroneous trial rulings warrant a new trial.

During his opening statement, the prosecutor asserted that the complainant had signed a deposition requesting the arrest of the defendant. The comment was interrupted by an objection from defense counsel, which was sustained, and the comment was ordered stricken. Thereafter, defense counsel moved for a mistrial. Defense counsel argued that, because the police picked up the defendant for questioning based on the complain-

ant's photographic identification, which was not admissible, the People should be precluded from permitting any witness to testify or suggest that the police were acting on any information when they first approached the defendant. To permit otherwise, defense counsel argued, would be to open the door to speculation by the jury that there had been some pretrial identification procedure, or that there had been an informer or some other witness who was "hidden" from them, and would permit the People to present by inference what they could not present directly, i.e., the complainant's pretrial photographic identification of the defendant.

The court noted that it had not interpreted the People's opening statement to suggest that the complainant had supplied the name of the defendant, but only that the name had come up during the police investigation. However, the court agreed that the complainant, as part of the People's direct case, could not testify that he had identified the defendant to the police (other than by description). Further, to the extent that the People's opening statement could be interpreted to suggest the contrary, a curative instruction would be given. Such a curative instruction was subsequently given. However, the court held, in light of, *inter alia*, counsel's argument that the arrest of the defendant was essentially random, a police witness would be permitted to testify, without elaboration, that the defendant's name had "come up" during the course of their investigation. Defense counsel excepted to the court's ruling insofar as it concerned such testimony by the police. The court also responded to an earlier request by defense counsel for a preliminary ruling concerning the complainant's failed lineup identification. Defense counsel argued that the only circumstance under which the complainant's pretrial photographic identification could be elicited by the People would be if he suggested that the complainant's identification testimony was a recent fabrication. Accordingly, defense counsel sought a ruling to the effect that, as long as he did not suggest such a recent fabrication, he would be permitted to elicit the fact that the complainant was unable to identify the defendant at a lineup without opening the door to any questions by the People concerning either the complainant's photographic identification, or the fact that, after the lineup, the complainant told the police that he had tentatively identified two persons out of the lineup, one of whom was the defendant, or to an in-court identification by the complainant. The court held that it could not make an absolute ruling in the abstract, and that it would have to hear the questions asked by the defense counsel before it could determine whether such questions opened the door to

further inquiry by the People and, if so, the scope of such inquiry.

On the facts presented, the court correctly ruled that the complainant would not be permitted to testify on direct that he had identified the defendant to the police other than by description (*see, People v Holt,* 67 NY2d 819; *People v Trowbridge,* 305 NY 471). Further, to the extent that the People's opening statement could be interpreted to have suggested the contrary, the court properly sustained defense counsel's objection thereto and ordered the comment stricken. Given such remedial measures, the discussion at the sidebar, and the lack of a further objection after the court issued a subsequent curative instruction, the defendant's objection to the statement must be deemed to have been satisfied (*see, People v Simms,* 222 AD2d 622, *supra*). Indeed, in arguing at the sidebar, defense counsel stated that in objecting to the statement when made, his intent had been to secure a curative instruction.

Further, the court did not err in holding that the People could elicit from a police witness, without elaboration, that the defendant's name had come up during the course of the investigation (*see, People v Williams,* 193 AD2d 826; *People v Armstead,* 134 AD2d 601).

Moreover, the court did not err in holding that, depending upon the questions asked by defense counsel concerning the unsuccessful lineup procedure, the door might be opened to additional inquiry by the People (*see, People v Brown,* 78 NY2d 874; *People v Bolden,* 58 NY2d 741; *People v Johnson,* 224 AD2d 635; *People v Mahone,* 206 AD2d 263; *People v Howard,* 193 AD2d 620).

The defendant's remaining contentions are either unpreserved, without merit, or do not warrant reversal of his conviction. Bracken, J. P., Ritter and Altman, JJ., concur.

Friedmann, J., dissents and votes to reverse the judgment appealed from, and to order a new trial, with the following memorandum in which Goldstein, J., concurs: Because I am persuaded by a review of the record that the Trial Judge interfered excessively with the presentation of proof, denigrated defense counsel, and made numerous erroneous evidentiary rulings that bolstered the prosecution's case while prejudicing the defense, I respectfully dissent.

The 16-year-old complainant was robbed at knifepoint by two men on the street. The crime took all of 15 seconds, and the men made off with $3.

The defendant's defense at trial was that he had been misi-

dentified as one of the perpetrators. Although the complainant picked the defendant's picture out of a photographic array on the basis of which the defendant was sought out and arrested, the victim was unable to identify the defendant in a lineup. This was so notwithstanding the fact, as the complainant testified at the suppression hearing, that he was told before viewing the lineup that someone named "Richard Brown" had been arrested on the instant charges, and had confessed to the crime. An hour after the lineup was held, however, the complainant telephoned the police, apparently from home, and informed them that on reflection he believed that either Number 3 or Number 4 (the defendant was Number 4) "might have been" one of his robbers. The court ruled that this post-lineup telephone call was not admissible as an identification. Accordingly, the court suppressed the pretrial identifications, and ruled that the victim could describe his assailant but could not make an in-court identification.

Critical to the defendant's case at trial was the fact that the descriptions of the two robbers contained in the complainant's signed statement to police were inconsistent with the descriptions that the victim gave at trial. As defense counsel attempted to explore these discrepancies during cross-examination, the court interrupted and accused him of "mischaracterizing the testimony * * * multiple times". Insisting that the complainant's description of his two attackers at trial was "clear", the court summarized it (e.g., "the man with the Jamaican accent was the shorter man, the man with the shorter hair"), and went on to suggest that any variations from the police report were due to the fact that the recording officer must have "made a mistake when he wrote it down". In response to defense counsel's vigorous objections and demands for a mistrial, the court issued a curative instruction, charging the jurors: "[W]hen I say that the complaining witness testified a certain way, that's really an opinion by the Court"—an opinion which, the court informed them, was less "important" than their recollection of the testimony. This was not an isolated instance of unwarranted intervention by the Trial Judge, who repeatedly interfered with the defendant's cross-examination of the prosecution's witnesses, ostensibly to "clarify" testimony but in fact effectively undermining counsel's cross-examination—punctuated by rebukes directed at defense counsel for his protests (*see, e.g., People v Yut Wai Tom,* 53 NY2d 44, 54-61; *People v Ellis,* 62 AD2d 469).

In addition, the court issued numerous erroneous rulings that compounded the prejudice suffered by the defense. For

example, when defense counsel proposed placing before the jury the fact that the victim had been unable to identify the defendant in a lineup, the court ruled that it would allow the prosecution to respond to any such line of questioning by adducing evidence that the complainant telephoned the police an hour after the lineup to report that he had "narrowed it down" to Number 3 or Number 4. However, this non-identification was inadmissible for many reasons, not least of which was the fact that it was tainted by the complainant's expectation that "Richard Brown", who the police told him before the lineup had confessed to the crime, would be included in the array.

During his opening statement, the prosecutor told the jury that the complainant had met with a detective at police headquarters, where he "signed a deposition, requesting that this Defendant, Richard Brown, be arrested". Although the court struck the remark, it did so while reprimanding defense counsel for objecting too strenuously, and it denied counsel's motion for a mistrial. Thereafter the court permitted the arresting officer to testify that he sought out the defendant as a suspect in this crime when, "during the course of his investigation", he interviewed the complainant and "the name Richard Brown came up". These remarks served to inferentially bolster the People's case (*see, e.g., People v Holt,* 67 NY2d 819; *People v Trowbridge,* 305 NY 471; *People v Gordillo,* 191 AD2d 455; *People v Bryan,* 179 AD2d 667; *People v Vasquez,* 120 AD2d 757).

The prosecutor was further permitted to impermissibly strengthen his case by eliciting testimony from his two principal police witnesses that they had received awards for acts of "heroism" in the line of duty, such as for rescuing a dying baby, for saving the life of a disabled man suffering an epileptic seizure, and for sustaining broken ribs while arresting a murder suspect. Defense counsel's objections were overruled. Thereafter, the prosecutor exploited this testimony on summation, arguing that such exemplary officers (one of whom was described as "A life saver. Countless awards. Putting his body on the line for this community"), were exceptionally deserving of belief, and were certainly above "framing" the defendant. Again counsel's objections were overruled. However, "credibility" was central to this case. Among other things, the defendant charged that his "statement" as recorded by the police officers—according to which he admitted being at the scene of the crime (although not actively involved in its commission)—was involuntarily obtained.

In my view, the cumulative effect of all of these improprieties

deprived the defendant of a fair trial, such that his conviction should be reversed and a new trial ordered (*see, e.g., People v Jackson,* 143 AD2d 363, 364; *People v Torriente,* 131 AD2d 793; *People v Vasquez, supra*).