People v Martinez (2022 NY Slip Op 00037)





People v Martinez


2022 NY Slip Op 00037


Decided on January 5, 2022


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 5, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
LEONARD B. AUSTIN
COLLEEN D. DUFFY
CHERYL E. CHAMBERS
JOSEPH J. MALTESE, JJ.


2016-13019
 (Ind. No. 392/11)

[*1]The People of the State of New York, respondent,
v
Asim Martinez, appellant.


Patricia Pazner, New York, NY (Jonathan Schoepp-Wong of counsel), for appellant.
Michael E. McMahon, District Attorney, Staten Island, NY (Morrie I. Kleinbart and Thomas B. Litsky of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Richmond County (William Garnett, J.), rendered December 2, 2016, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is modified, on the law, by directing that the sentence imposed run concurrently with a sentence imposed on February 26, 2013, in connection with the defendant's prior conviction of criminal possession of a weapon in the second degree; as so modified, the judgment is affirmed.
The defendant was charged with intentionally killing the unarmed victim by discharging 12 bullets into his body. According to the medical examiner, two of the wounds to the victim's chest area were fatal. The shooting occurred minutes after a brief physical altercation involving, among others, the victim, the victim's girlfriend, and the defendant's wife.
A surveillance video of the shooting shows the victim walking down a hallway, followed, approximately one minute later, by the defendant, who is first seen peering down the hallway toward the victim from a stairwell, showing only the left side of his body. The victim then approaches the defendant, who steps fully into view, revealing a firearm in his extended right hand, and immediately begins firing at the victim at close range. The defendant continues firing while standing directly over the victim, who is lying on the floor. The defendant then pauses, steps closer to the victim's head, leans down, and fires again.
The defendant previously was convicted, after a jury trial, of murder in the second degree and criminal possession of a weapon in the second degree. However, the conviction of murder in the second degree was subsequently reversed by this Court because of prosecutorial misconduct, and a new trial on that count was ordered (see People v Martinez, 127 AD3d 1236).
After the second trial, the defendant was convicted of murder in the second degree, and the Supreme Court directed the sentence to run consecutively to the sentence imposed on his prior conviction of criminal possession of a weapon in the second degree. The defendant appeals.
Contrary to the defendant's contention, the Supreme Court did not violate his right to be present when, on the second day of trial, it heard testimony from a single out-of-state witness in his absence. A defendant's statutory and constitutional right to be present at all material stages of his or her trial may be waived (see People v Parker, 57 NY2d 136), even where, as here, the defendant is in custody at the time of trial (see People v Epps, 37 NY2d 343). "A valid waiver of the right to be present at trial will be implied if the record reflects that the defendant is aware that trial will proceed even though he or she fails to appear" (People v Forrest, 186 AD3d 1395, 1397 [internal quotation marks omitted]). Here, before proceeding in the defendant's absence, the court determined, based on the surrounding circumstances, that the defendant's absence was deliberate, made a record of the reasons for its finding, and exercised its sound discretion upon consideration of all appropriate factors (see id. at 1398).
The defendant contends that he was deprived of a fair trial because the prosecutor elicited evidence of prior bad acts during the cross-examination of the defendant's expert and during the testimony of an expert rebuttal witness (see People v Molineux, 168 NY 264). Contrary to the defendant's contention, this evidence was properly admitted, inter alia, to explain the experts' opinions with respect to the defendant's extreme emotional disturbance defense (see People v Cass, 18 NY3d 553; People v Diaz, 62 AD3d 157, 168, affd 15 NY3d 40; People v Doczy, 210 AD2d 425; see also Matter of Lee v County Ct. of Erie County, 27 NY2d 432, 441). Additionally, the Supreme Court balanced the jury's need to be informed of the basis for the experts' opinions against the prejudice to the defendant (see People v Diaz, 62 AD3d at 168). In addition, the court's limiting instruction to the jury after each expert's testimony and as part of the court's final instruction served to alleviate any prejudice resulting from the admission of that evidence (see People v Beer, 146 AD3d 895, 896). To the extent any Molineux evidence was improperly admitted, any error was harmless in light of the overwhelming evidence of the defendant's guilt (see People v Arafet, 13 NY3d 460, 467; People v Braun, 199 AD2d 993).
The sentence imposed was not excessive (see People v Suitte, 90 AD2d 80, 95). However, under the circumstances of this case, the Supreme Court erred in directing that the defendant's sentence run consecutively to the sentence imposed on his prior conviction of criminal possession of a weapon in the second degree. "'So long as a defendant knowingly unlawfully possesses a loaded firearm before forming the intent to cause a crime with that weapon, the possessory crime has already been completed, and consecutive sentencing is permissible'" (People v Malloy, 33 NY3d 1078, 1080 [emphasis added], quoting People v Brown, 21 NY3d 739, 751). Here, the People failed to meet their burden of establishing that consecutive sentences were legal (see People v Boyd, 192 AD3d 1659).
Finally—and contrary to the view expressed by our dissenting colleagues—we find that the Supreme Court's questioning of witnesses did not deprive the defendant of a fair trial. "[A] trial judge is permitted to question witnesses to clarify testimony and to facilitate the progress of the trial, and, if necessary, to develop factual information" (People v Adams, 117 AD3d 104, 109 [internal quotation marks omitted]). However, "[a] Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness" (People v Yut Wai Tom, 53 NY2d 44, 57). That being said, not every departure from this principle requires reversal and a new trial (see People v Moulton, 43 NY2d 944, 946), and there is room for harmless error analysis so long as the trial court's actions were not so inherently prejudicial as to amount to a violation of the defendant's right to a fair trial (cf. People v Nelson, 27 NY3d 361, 371-372; People v Clyde, 18 NY3d 145, 153-154).
Here, while many of the Supreme Court's interventions were proper attempts to clarify testimony and facilitate the progress of the trial, we agree with our dissenting colleagues that other remarks would better have been left unsaid. Nevertheless, when the record is viewed as a whole, the court's conduct, to the extent it was improper, did not prevent the jury from arriving at an impartial verdict on the merits (see People v Moulton, 43 NY2d at 946; People v Russo, 41 NY2d 1091; People v Adams, 117 AD3d at 106; People v Jenkins, 25 AD3d 444, 445; People v Brown, 262 AD2d 570, 573, affd 95 NY2d 776; People v Gonzalez, 183 AD2d 783).
In reaching this conclusion, we are mindful that the Supreme Court's most objectionable interventions occurred during the testimony of the defendant's expert on extreme emotional disturbance, Marc Janoson. In relevant part, Janoson testified that the defendant had told him, during pretrial interviews, that he had "blacked out" after hearing that his wife had been hit in the face and that the defendant went "on remote control" and was "not fully aware of what he was doing." Janoson testified that the defendant told him that he did not remember the shooting itself or what happened thereafter until the defendant "sort of came to and began to snap out of it" some time later. Janoson did not speak with any fact witness other than the defendant. In addition to his pretrial interviews with the defendant, Janoson also administered the Minnesota Multiphasic Personality Inventory test (hereinafter MMPI-2) on the defendant. Janoson's expert opinion—which was extremely limited in its scope—was that the MMPI-2 test results were "consistent with [the] narrative" the defendant provided during his pretrial interviews.
In rebuttal, the People were permitted to introduce part of the defendant's testimony at the first trial, in which the defendant provided a much more detailed narrative of the events leading up to, and immediately following, the shooting. Specifically, the defendant testified that he purchased a firearm in 2008, which he kept in a locked safe in his bedroom closet. On the day of the shooting, while the defendant was in the bathroom, a brief physical altercation took place in the hallway just outside his sixth floor apartment between the defendant's wife and her sister, on the one hand, and the victim and his girlfriend, on the other. When the defendant came out of the bathroom, his wife told him that she had been punched in the face by the victim. The defendant testified that, upon seeing his wife crying and observing her face swollen, he became upset. He went to the bedroom closet and used his key to unlock the safe and retrieve the firearm, which was loaded with 12 rounds of ammunition. He then placed the firearm in his pocket and exited the apartment, walked down the stairs and stopped on each floor, looking for the victim. When the defendant reached the third floor, he observed the victim at the end of the hallway and asked him why he had punched the defendant's wife. When the victim answered with a profanity, the defendant "just blacked out," and did not remember pulling the trigger and shooting the victim. The defendant testified that he then walked to the ground floor and exited the building through the rear exit, which led to a basketball court. The defendant placed the gun in his pocket so that no one would see it and walked to the Staten Island ferry. He boarded the ferry and, while on the way to Manhattan, threw the gun overboard. The defendant then took the train to Brooklyn, where he stayed with his cousin. The defendant did not call his wife because he did not want anyone to know where he was.
The People also produced, in rebuttal, their own expert, Myles Schneider. In relevant part, Schneider testified that he first interviewed the defendant in 2012, at which time the defendant told him that he did not remember the shooting itself or what happened thereafter, and that "it was all a blur." However, when Schneider later compared this information to the much more detailed account given by the defendant at the first trial, Schneider concluded there was a "credibility problem" and that the defendant was malingering or faking.
Ultimately, the defendant's extreme emotional disturbance defense was undermined not by the Supreme Court's excessive questioning, but because the defense relied on inherently weak expert evidence that was belied by the defendant's own testimony at the first trial. In other words, considering the very narrow scope of Janoson's opinion testimony and its inherent limitations in establishing the defense of extreme emotional disturbance, we are not persuaded that the court's excessive interventions precluded the jury from arriving at an impartial verdict based on the merits (see People v Moulton, 43 NY2d at 946).
In closing, while we do not condone the Supreme Court's actions in this case, we disagree with our dissenting colleagues' characterization that the court "twice intimated" that the defendant was a "cold blooded killer." As it appears from the transcript, the court asked Janoson how the MMPI-2 could be used to distinguish between someone who acts out homicidally with no memory of the event and someone who knowingly sets out to commit murder, i.e., what the court called a "cold blooded killer." The question was certainly relevant—though it should have been asked by the prosecutor on cross-examination, and markedly, the court used a poor choice of words.
DILLON, J.P., CHAMBERS and MALTESE, JJ., concur.
DUFFY, J., dissents, and votes to reverse the judgment, as a matter of discretion in the interest of justice, and to remit the matter to the Supreme Court, Richmond County, for a new trial before a different Justice, with the following memorandum, in which AUSTIN, J., concurs:
In 2011, the defendant was charged with, among other things, murder in the second degree and criminal possession of a weapon in the second degree arising out of the shooting death of the boyfriend of the defendant's second-floor neighbor. The defendant shot the victim 12 times after a verbal altercation escalated between the defendant's wife and that downstairs neighbor in the apartment building where the defendant, his wife, the neighbor, and the victim all lived. On the day of the incident, the defendant intervened in the altercation between his wife and the neighbor, and spat at the neighbor. Shortly thereafter, the victim pounded on the defendant's door and, upon it being opened by the defendant's wife, spat at the defendant's wife and punched her in the face. The defendant then left his apartment and shot the victim 12 times in the hall of the third floor of their apartment building.
In his first trial, the defendant was convicted by a jury of murder in the second degree and criminal possession of a weapon in the second degree. On appeal, however, this Court reversed his conviction for murder in the second degree on the ground of prosecutorial misconduct (see People v Martinez, 127 AD3d 1236). This Court held that the prosecutor's actions "unfairly deprived the defendant of the ability to present his defense of extreme emotional disturbance" (id. at 1237). The matter was remitted for a new trial on that charge (see id. at 1236). Upon remittitur, the defendant was again convicted, upon a jury trial, of murder in the second degree and thereafter sentenced to a term of imprisonment of 25 years to life.
Although I agree with my colleagues that the defendant's right to be present during the trial was not violated and that the Supreme Court erred in directing that the defendant's sentence run consecutively to the sentence imposed on his prior conviction of criminal possession of a weapon in the second degree, contrary to the position of my colleagues in the majority, I would reverse the conviction and remit for a new trial on the ground that the defendant was deprived of a fair trial.
At trial, the defendant presented an affirmative defense that his actions at issue occurred when he was under extreme emotional disturbance such that he did not possess the requisite mens rea for the charge of second degree murder. During the trial, among other things, the Supreme Court's twice-repeated use of the phrase "cold blooded killer" during its own improper cross-examination of the defendant's expert witness during that witness's direct testimony served to undermine the defendant's theory of the case and may have influenced the jury to reject the defense of extreme emotional disturbance on the ground that the court viewed the defendant to be "a cold blooded killer." Not only did the court's repeated and egregious questioning of the defendant's expert witness, particularly during direct examination, among other things, assist the People in eliciting testimony, it denigrated the defendant's affirmative defense. Moreover, the court's questions aided the prosecutor in eliciting evidence of the defendant's prior bad acts during the cross-examination of the defense's expert and during the testimony of an expert rebuttal witness (see People v Molineux, 168 NY 264).
A defendant's "right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (People v Crimmins, 36 NY2d 230, 238). As set forth below, I disagree with the majority's determination that the improper actions and interjections of the Supreme Court fall within the realm of harmless error subject to the overwhelming evidence standard and outside of the fair trial analysis (see People v Nelson, 27 NY3d 361, 371-372; People v Crimmins, 36 NY2d at 238). The Court of Appeals has admonished that it is the "substance and not the number of questions asked [that] is the important consideration" (People v Yut Wai Tom, 53 NY2d 44, 58). Here, the court's use of the term "cold blooded killer"—in conjunction with its numerous other improper interjections and disparate treatment of the parties' experts—was prejudicial so as to have deprived the defendant of a fair trial, warranting reversal.
I note that the defendant's contention that he was deprived of a fair trial due to the Supreme Court's interjections during the questioning of witnesses is unpreserved for appellate review, since defense counsel did not make a timely objection to the court's conduct (see CPL 470.05[2]; People v Sookdeo, 164 AD3d 1268, 1269-1270). Nevertheless, under the circumstances presented, the defendant's contention should be reached in the exercise of our interest of justice jurisdiction (see CPL 470.15[6][a]).
As my colleagues in the majority acknowledge, a trial court has discretion to question witnesses to "clarify[ ] confusing testimony and facilitat[e] the orderly and expeditious progress of the trial" (People v Yut Wai Tom, 53 NY2d at 57). Nevertheless, the Court of Appeals has cautioned that "the power is one that should be exercised sparingly" (id. [emphasis added]), observing that "[a] Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness" (id. [emphasis added]). Indeed, the Court has admonished that "there may be greater risk of prejudice from overintervention than from underintervention" (id. [internal quotation marks omitted]); thus, the trial judge "should be guided by the principle that his [or her] function is to protect the record, not to make it" (id. at 58).
Because of the risk that the jury might be influenced by the trial court's actions, the court must be "scrupulously free from and above even the appearance or taint of partiality" (People v De Jesus, 42 NY2d 519, 524). Thus, "'care must be taken to guard against the possibility that the stated opinion of the trial court or even the suggestion of an opinion might be seized upon by the jury and eventually prove decisive'" (id. at 524, quoting People v Bell, 38 NY2d 116, 120). Indeed, "even proper questions from trial judges present significant risks of prejudicial unfairness, particularly when the trial judge indulges in an extended questioning of witnesses" (People v Davis, 147 AD3d 1077, 1079 [internal quotation marks omitted]; see People v Retamozzo, 25 AD3d 73, 87).
The trial judge's obligation to avoid taking on even the "appearance of an advocate at trial" (People v Arnold, 98 NY2d 63, 67) is rooted in "'a fundamental principle of criminal jurisprudence'" (People v De Jesus, 42 NY2d at 523, quoting People v McLaughlin, 150 NY 365, 375), that every person accused of a crime has a right to "'have a fair and impartial trial before an unbiased court'" (People v De Jesus, 42 NY2d at 523, quoting People v McLaughlin, 150 NY at 375). Thus, a trial judge's failure to "be scrupulously free from and above even the appearance or taint of partiality" violates the defendant's fundamental right to a fair trial (People v De Jesus, 42 NY2d at 524; see People v Yut Wai Tom, 53 NY2d at 61).
With these principles in mind, it is difficult to conceive of a more fundamental deprivation of a defendant's right to a fair trial than a trial judge repeatedly and flagrantly intervening with the questioning of witnesses in a manner that conveys the appearance of serving as an advocate for the People. Consequently, where a defendant raises a meritorious contention that he or she was deprived of a fair trial due to the trial court's interjections during the questioning of witnesses, this Court has consistently reached the issue in the interest of justice despite defense counsel's failure to raise objections to the trial court's interjections (see e.g. People v Mitchell, 184 AD3d 875, 876; People v Ramsey, 174 AD3d 651, 651; People v Sookdeo, 164 AD3d at 1269; People v Davis, 147 AD3d at 1079; People v Chatman, 14 AD3d 620, 621).
In this case, the Supreme Court engaged in a pattern of repeatedly interjecting itself into the questioning of the witnesses throughout the trial—in a way that benefitted the People and was detrimental to the defendant.
The most egregious example of the Supreme Court's conduct is seen in the court's consistent interruption of the direct and cross examination of Marc Janoson, the defendant's expert witness. The court's questions highlighted perceived deficiencies in Janoson's methodology and challenged the basis of his opinion and his analytical rigor. Indeed, during defense counsel's direct examination of Janoson, the court interrupted defense counsel's questions more than 30 times. For example, the court interrupted defense counsel's examination of Janoson with several questions [*2]about the test instrument he had used to evaluate the defendant, suggesting that the instrument was suited for other purposes:
"THE COURT: Are these tests used for other purposes other than determining extreme emotional disturbance or insanity?
"THE WITNESS: Yes.
"THE COURT: What other purposes are these tests used for?
"THE WITNESS: Well, the instrument that I am going to testify about today, the MMPI-2, is used for literally hundreds of reasons. It is used to select police officers. It is used to select CIA officers and so on. There are literally hundreds of uses.
"THE COURT: Is it used for determining somebody's professional abilities or professional strengths?
"THE WITNESS: Well, it's used as part of an evaluation to assess emotional stability. It's really a personality test for both the normal personality and the so-called abnormal personality.
"THE COURT: It has no application to employment?
"THE WITNESS: Oh, it is used in employment screenings all the time.
"THE COURT: For what purpose?
"THE WITNESS: Well, for example, I use it in my practice to evaluate police officer candidates who have been disqualified by, let's say, the NYPD, and they come to me for an appeal psychological [sic]. As part of my testing, I will give them the MMPI-2 or another personality test as part of the screening that I do because they are asking me to write an appeal to protest the fact that they have been disqualified by the psychological service of the NYPD.
"THE COURT: Or they have been dismissed by the NYPD.
"THE WITNESS: Well, that's a different thing. Fitness for duty is another type of evaluation. Different than an appeal for a candidate.
"THE COURT: Do you do those as well?
"THE WITNESS: Yes, I do.
"THE COURT: Using the same instrument or test?
"THE WITNESS: Well, I sometimes use the MMPI. There are other instruments that have norms based on law enforcement candidates and law enforcement personnel that I sometimes will substitute for the MMPI. But I often use the MMPI.
"THE COURT: Go ahead, [defense counsel]."
Although these questions were not overtly prejudicial to the defendant, the Supreme Court's inquiry into an area totally irrelevant to the trial disrupted defense counsel's direct [*3]examination and detoured his examination of his witness. Moreover, taken together with the court's other inquiries of this witness, these questions may have served to communicate to the jury the court's skepticism about the sufficiency and validity of the test instruments used by Janoson in undertaking his examination of the defendant. For example, the court again interrupted the direct examination on Janoson to highlight the age of the database Janoson used:
"THE COURT: So is the database from 1989?
"THE WITNESS: Yes, it is.
"THE COURT: Twenty-seven years ago?
"THE WITNESS: Correct."
Further interruptions by the Supreme Court during this direct examination demonstrated the court's skepticism about Janoson's testimony. After Janoson explained that the test instrument included scales to measure the honesty and frankness of the tested individual relative to the national average, and that the defendant was "at the national average on the lie scale," the court interjected, "[s]o he can potentially lie as much as anybody else could lie; is that right?" The witness responded, "[t]hat's one way of saying it."
Janoson testified that his test of the defendant demonstrated that the defendant was reporting memory problems, and that on various subscales the defendant measured in a way that is associated with people who dissociate. Janoson likened the defendant to "people . . . who at times will act in ways that they are not fully conscious and fully aware of what they are doing." He also testified that the defendant had an elevated score on the over-controlled hostility scale, which he described as "the key scale in trying to figure out what may have happened in this case." According to Janoson, this scale was used to differentiate people "who ordinarily were not violent but who provoked one time too many, lost it and acted out homicidally, from men who also acted out homicidally but who were out of control most of the time." Janoson further testified that the defendant's test results indicated that, "when provoked one time too many, [the defendant had] the psychological propensity to lose it and to act out homicidally." The Supreme Court then interjected:
"THE COURT: How would you distinguish that from a cold blooded killer?
"THE WITNESS: Well, that's really a moralistic kind of view, where my data is strictly psychological. I mean, I am telling you that a person has, according to this instrument, has the potential to act out homicidally when they are provoked one time too many based on the over-controlled hostility scale.
"THE COURT: So a cold blooded killer would also act out; is that correct? If he was provoked. How would you tell the difference?
"THE WITNESS: I'm not sure that I understand the question.
"THE COURT: The data that you have, there are people who have anger that built, correct?
"THE WITNESS: Yes.
"THE COURT: And they commit murders knowing what they are doing. And then you are saying—
"THE WITNESS: No, no. You said knowing—
"THE COURT: Let me finish.
"THE WITNESS: Sorry.
"THE COURT: And there are some people who don't have a memory of what they've done. How do you tell the difference based upon this test?
"THE WITNESS: All I can say—all I said in my report is the data on the MMPI is consistent with the narrative that [the defendant] gave.
"THE COURT: So you don't have an opinion on whether he suffered from extreme emotional disturbance; you are just saying it is possible based upon the results of your test, is that correct?
"THE WITNESS: I would say it's probable based on the results of the test. I wasn't in his head. I can't say absolutely. I wouldn't say absolutely" (emphasis added).
Since the Supreme Court posed these questions during the direct examination of the defendant's expert, the colloquy had the dual effect of both prejudicing the jury against the defendant, whom the court twice intimated was a "cold blooded killer," and denigrating the defense by disrupting defense counsel's effort to elicit favorable testimony from his expert.
Similarly, the Supreme Court interrupted the People's voir dire of Janoson to highlight that, although he was a licensed psychologist, he was not certified in forensic psychology:
"THE PROSECUTOR: You are going to be testifying on the subject matter of EED, extreme emotional disturbance, right?
"THE WITNESS: Correct.
"THE PROSECUTOR: You are not board certified in forensic psychiatry, right—psychology?
"THE WITNESS: No, I am not what's called diplomated. I think that's what you mean by board certified. I am licensed but not board diplomated.
"THE COURT: Licensed in what?
"THE WITNESS: Psychology.
"THE COURT: But you are not certified. Are you certified in forensic psychology? Are you? Yes or no.
"THE WITNESS: No.
"THE COURT: Go ahead."
The Supreme Court subsequently interrupted defense counsel's direct examination of Janoson to note that the People's expert, in contrast to Janoson, "is a certified forensic psychiatrist; is that correct."
During cross-examination, the Supreme Court continued its inquiry of Janoson in ways that appeared designed to assist the People in attacking Janoson's testimony. For example, the court asked numerous questions about why Janoson used a California company to score the test data [*4]rather than a Minnesota company, eliciting that the University of Minnesota held the copyright on the test. The court also elicited testimony about the defendant's criminal past from Janoson, the defendant's expert, and asked him multiple questions challenging the manner in which he had conducted his evaluation and conclusions he drew from his work:
"THE COURT: Does the interview include what [the defendant] did before and after the crime?
"THE WITNESS: Well, yes. He told me that he had a history of being arrested and he told me what they were for and so on.
"THE COURT: Did you discuss with him the facts of this case?
"THE WITNESS: Yes.
"THE COURT: And that had no impact on your decision?
"THE WITNESS: I don't know how you could say it had no impact. I mean—
"THE COURT: Did you go solely by the test or did you take into consideration what actions he acknowledged he took before the crime?
"THE WITNESS: Yes.
"THE COURT: And you took into consideration his actions after the crime?
"THE WITNESS: Yes."
Thereafter, when the prosecutor moved on to another question after cross-examination as to what Janoson knew about the defendant's criminal history, the Supreme Court interrupted, stating, "[t]he question was—we have to stay on it. The question was were you aware of this 1999 incident [where the defendant allegedly fired a weapon at another individual]?"
In addition, the Supreme Court asked a number of questions during the cross-examination of Janoson which served to highlight gaps in what the defendant had told the witness, including a question that incorrectly purported to summarize the testimony: "So sir, he told you nothing about what happened inside the apartment that he remembered before he left the apartment and shot [the victim]; is that correct?" The witness responded in the negative.
After Janoson reiterated that it was not his practice to conduct "collateral" interviews of other witnesses, the Supreme Court followed up with numerous questions about whether Janoson had requested police documents to confirm that someone allegedly entered the defendant's home, or had reviewed the defendant's sworn statements from prior proceedings. When Janoson responded that he had done neither, these questions served to allow the jury to infer that Janoson's procedures did not measure up to what the court thought he should have done. Similarly, the court asked two follow-up questions supporting the People's effort to attack Janoson's procedures with respect to the scoring report:
"THE COURT: Did any of these cautions that were given to you by [the scoring service] make you hesitate to come to the conclusion that you did?
"THE WITNESS: Well, no. Because [the prosecutor] is cherry picking the narrative. I mean, the big picture—
"THE COURT: My question is did any of these cautions make you hesitate in your opinion?
"THE WITNESS: No."
Moreover, on multiple other occasions throughout Janoson's cross-examination, the Supreme Court asked questions and then cut off Janoson before he could answer.
In contrast, the Supreme Court treated the examination of the People's expert witness very differently. When defense counsel was cross-examining the People's expert, the court repeatedly told defense counsel to "let the doctor" testify when counsel interrupted the answer. The court also improperly summarized the testimony of the People's expert on direct: "What you're saying is, when he tells you that he blacked out, was dazed or was in a fog, you don't find that credible in light of what he said before and what he did after the shooting. Is that correct?" The witness answered affirmatively.
Other portions of the record also suggest that the Supreme Court acted as an advocate for the People.
For example, when the People elicited testimony from one of their witnesses—a detective—that a photograph that he had taken at the crime scene was a picture of one of the victim's bullet wounds, the Supreme Court took over the examination:
"THE PROSECUTOR: What's depicted in this photograph?
"THE WITNESS: Bullet wound.
"THE COURT: Detective, your testimony in regard to what are bullet wounds is based upon your experience as a crime scene detective; is that correct?
"THE WITNESS: Yes. Also with the MLI from the OCME office.
"THE COURT: What is MLI?
"THE WITNESS: Medical Legal Investigator.
"THE COURT: That's a course that you took?
"THE WITNESS: No, no. They are there. [A] representative from the OCME's office that documents wounds.
"[DEFENSE COUNSEL]: Objection. Move to strike that.
"THE COURT: So that person was present with you?
"THE WITNESS: Yes.
"THE COURT: But when you are describing to the jury bullet wounds, that's based upon your experience as a crime scene detective; is that correct?
"THE WITNESS: That's correct."
The court did not acknowledge or rule on the defense objection.
The Supreme Court again interjected itself during the People's cross-examination of [*5]the defendant's wife, interrupting even though there was no pending objection to ask questions which highlighted what the court perceived were inconsistencies between the testimony of the witness and what she had previously told the police and reported in her call to the 911 emergency number:
"THE PROSECUTOR: Do you remember telling Investigator Zuffi from the day of the shooting until after he was arrested you never heard from [the defendant] until he called you from prison?
"THE WITNESS: I had explained to him that he had called like a couple of times, but I didn't really speak to him like conversation-wise until Rikers Island.
"THE COURT: The question was, did you tell Investigator Zuffi that you had hadn't spoken to your husband between September 3rd and the time that he was arrested; did you tell him that?
"THE WITNESS: Yes."
Shortly thereafter, the People questioned the witness about her testimony and what she had told the police:
"THE PROSECUTOR: You didn't tell the police it was Fatima's boyfriend [the victim], right?
"THE WITNESS: I said it was someone who came to my door and punched and spit in my face.
"THE PROSECUTOR: They asked you that person's name, correct?
"THE WITNESS: Well, I knew it was Fatima at the door.
"THE PROSECUTOR: You told them Fatima Browning punched you?
"THE COURT: The issue is, what did you tell the 911 operator?
"THE WITNESS: I told the 911 operator someone came to my door and spit and punched me in my face
"THE COURT: Did you identify that person as Fatima?
"THE WITNESS: Yes."
Although some of the multitude of questions posed by the Supreme Court may have served to facilitate the progress of the trial and clarify testimony, "even proper questions from trial judges present significant risks of prejudicial unfairness, particularly when the trial judge 'indulge[s] in an extended questioning' of witnesses" (People v Retamozzo, 25 AD3d at 87, quoting People v Yut Wai Tom, 53 NY2d at 58; accord People v Davis, 147 AD3d at 1079). Here, "the court's questioning of the witnesses far exceeded what was necessary to 'clarify[ ] confusing testimony' or facilitate 'the orderly and expeditious progress of the trial'" (People v Robinson, 151 AD3d 758, 759, quoting People v Yut Wai Tom, 53 NY2d at 57).
In sum, the Supreme Court's extensive questioning of the defendant's expert improperly disrupted defense counsel's examination (see People v Yut Wai Tom, 53 NY2d at 58-59; People v Ramsey, 174 AD3d at 652), usurped the role of the prosecutor, elicited significant testimony in the form of cross-examination during the defendant's direct examination of his expert [*6]witness, "appeared to display an inordinate amount of skepticism in the witness' testimony which was crucial to the defense" (People v Carter, 40 NY2d 933, 934; see People v Mendes, 3 NY2d 120, 121), and "generally created the impression that [the court] was an advocate for the People" (People v Savillo, 185 AD3d 840, 842; see People v Ramsey, 174 AD3d at 652).
Indeed, the Supreme Court's hostility to the defense was also made manifest on several other occasions on the record, although outside the presence of the jury. For example, the court indicated that it would strike Janoson's testimony unless the defendant testified, and later proposed instructing the jury that one of defense counsel's summation arguments was unsupported by the record and based on "sheer speculation." In both instances, only the prosecutor's intervention convinced the court not to take these actions.
Viewing the record as a whole, the Supreme Court's conduct, taken together with, inter alia, its disparate treatment of the two experts (see People v Yut Wai Tom, 53 NY2d at 58-59; People v Retamozzo, 25 AD3d at 86), its efforts to point out inconsistencies in the testimony of the defendant's wife (see People v Estevez, 155 AD3d 650, 651; People v Zamorano, 301 AD2d 544, 545), and its assistance in eliciting testimony from the People's witnesses (see People v Yut Wai Tom, 53 NY2d at 58-59), "demonstrated apparent bias in favor of the People" (People v Robinson, 151 AD3d at 761, 762). This improper interference deprived the defendant of a fair trial, and thus, a new trial is warranted before a different Justice (see People v Savillo, 185 AD3d at 842; People v Ramsey, 174 AD3d at 652; People v Robinson, 151 AD3d at 762).
In light of this determination, I need not reach the defendant's remaining contention.
ENTER:
Maria T. Fasulo
Clerk of the Court